DIXON GRAY v. THE STATE OF TEXAS EX REL. W. A. LANGHAM.

Decided November 24, 1898.

**1. Quo Warranto—Jurisdiction of District Court.**

The constitutional amendment of 1891 and subsequent legislation thereunder conferring upon the district court jurisdiction to try contested election cases did not deprive it of the power to try the right to an office by quo warranto proceedings.

**2. Same—Pleading—Ballots in Evidence.**

In a quo warranto proceeding an averment that enough illegal votes were cast to change the result is sufficient, without an allegation of fraud in the making of the official returns, to admit the ballots in evidence.

**3. Same—Same.**

An allegation that the returns are false and that a true count will show a smaller vote for the respondent, and drunkenness of a returning officer prevented him from counting certain votes for relator, is sufficient, in the absence of special exception, to admit evidence of the ballots to contradict the returns.

**4. Same—Preservation and Custody of Ballots.**

Since the statute does not provide for the custody of ballots cast in a city election, they are admissible in evidence in a contest for the office when shown to have come from a safe custody and to have been preserved intact. See the opinion for case where the ballots were properly preserved by sealing up the boxes and depositing them in a bank vault.

**5. Same—Recount and Illegal Votes Subtracted.**

A recount of the ballots in the boxes having been made and its correctness not being controverted, it was proper for the court to instruct the jury that each party had received the number of votes so shown, and that from such numbers the jury should deduct any illegal ballots.

**6. Jury Panel—Challenge for Cause.**

It is not error to require the parties to an action to pass upon a jury list or panel containing less than twenty-four names, nor is it a ground of challenge for cause in a quo warranto contest for an office that a juror belonged to an opposing political party, or voted against the challenger.

**7. Quo Warranto Contest for Office—Numbering Ballots.**

The fact that two ballots each bear the same number is not of itself a sufficient ground for excluding them.

**8. Evidence—Certified Copies.**

Under the statute, certified copies of a record are admissible only where the record itself would be admissible, and the original is not rendered inadmissible because certified copies thereof could be used.

**9. Same—Practice—Harmless Admission of Evidence.**

Error in the admission of evidence to show a fact conceded in the case, and in admitting declarations of an illegal voter as to where he came from, where it appears that he was an illegal voter, is harmless.

**10. Same—Jurisdiction and Judgment of the Court.**

In a quo warranto contest for an office, the amount of its salary is not material to the court's jurisdiction, and a judgment therein awarding the office and also its franchises, privileges, and emoluments is proper, as these latter go with the office.

APPEAL from Jefferson. Tried below before Hon. STEPHEN P. WEST.

*Votaw, Martin & Chester,* for appellant.

*Broocks, Greer & Broocks* and *O'Brien, Bordages & O'Brien,* for appellee.

GARRETT, CHIEF JUSTICE.—This was a quo warranto to try the title to the office of marshal of the city of Beaumont. The appellant, Dixon Gray, and the appellee, William A. Langham, were opposing candidates for that office at an election held on Tuesday, the 5th day of April, 1898. The returns of the election made by the officers of the election and canvassed by the city council showed that Gray had received 560 votes and that Langham had received 553 votes. Gray was declared elected, and thereupon qualified and entered upon the discharge of the duties of the office. The district attorney of the First Judicial District filed a petition in the name of the State of Texas, at the relation of Langham, to oust Gray from the office and to induct Langham therein. The petition alleged that there had been an incorrect count of the votes, as shown by the official returns, in all of the wards of the city except ward number 1; that the official returns of ward number 2 were false, deceptive, and misleading, and that there was not a fair and correct count, tally, and return of the votes cast in that ward, and that they showed a larger majority for the defendant by at least 20 votes; that the official returns of ward number 3 were likewise false, deceptive, and misleading, and that said incorrect count was due to the fact that one of the officers of the election, whose duty it was to tally the votes, was so excessively drunk that he did not and could not perform his duties, and did not tally certain votes cast for the relator. It was further alleged that various illegal voters, stating their names, numbers on the poll list, the box at which they voted, and the causes of disqualification, voted in the election for the defendant. A sufficient number of illegal votes were alleged to change the result of the election. A general demurrer to the petition was overruled by the court.

There were only three election precincts or wards in the city. The ballots were admitted in evidence and a recount thereof was made under

the direction of the court in the presence of the jury, which resulted as follows: In ward number 1 there was a majority of 102 votes in favor of Langham, showing no change from the official returns as to the majority returned, but in this box there were two ballots each having thereon the number 35, one cast for Gray and the other for Langham, and two ballots each having thereon the number 19, both cast for Langham. These ballots were counted. In ward number 2, by the official returns, Gray had a majority of 80 votes; by the recount he received a majority of 76 votes. In ward number 3 the official returns gave Gray a majority of 29 votes, and by the recount he received a majority of 30 votes. In this box there were two ballots having thereon the number 14, both of which were for Langham and were counted for him. The recount showed a net gain in favor of Langham of 3 votes, which still left a majority of four votes in favor of Gray. The court charged the jury that the count of the ballots before them showed that Gray had received 588 votes and that Langham had received 554 votes, and that in reaching their conclusion the jury should take those figures as a basis from which to deduct any illegal votes that they might find were cast for the parties. There was much evidence heard upon the question of illegal votes, and although it showed undisputably that some of the votes cast were illegal, yet it is impossible to say that the jury found enough illegal votes cast for Gray in excess of those cast for Langham to render the error, if any, in giving the instruction above referred to harmless. Before ordering a recount of the ballots, the court heard evidence as to the care and custody thereof. The presiding officers in the several wards were examined, and it appeared from their testimony that immediately after the ballots were counted the tops of the boxes in which they had been deposited and were contained were fastened down, and that the apertures in the tops were sealed over with paper with the names of the respective presiding officers written across the seals. Each of the presiding officers carried the ballot box of his ward, after it had been closed and sealed, to his home on the evening of the election, and on the next day delivered it to the mayor in the presence of the city council. The mayor took the boxes on the same day and had them deposited in the vault of the First National Bank of Beaumont. Officers of the bank produced them in court in obedience to a subpoena duces tecum. On production in court the boxes appeared intact. There was no appearance whatever to indicate that the boxes had been tampered with. From the testimony of the presiding officers, the mayor, the employes of the bank, and others, it is altogether improbable that the boxes had been tampered with or that there was any opportunity for any interested person to do so. There is sufficient evidence to support the verdict of the jury that Langham received the greater number of legal votes cast at the election, and we so conclude.

The first assignment of error presented by the appellant is upon the alleged error of the court in overruling the general demurrer to the petition. Upon oral argument the proposition was advanced that, the statutes of this State having provided an adequate remedy for the relator to

try the right to the office and for the recovery thereof by contest, quo warranto would not lie, and in support of this proposition cited People ex rel. v. Cover, 50 Illinois, 100. But there is a considerable difference between that case and the case now before this court. In People v. Cover the relator prayed for a writ of mandamus against the county clerk to issue to the relator a certificate of election as sheriff of the county after a certificate had been issued to his opponent and after a contest of the election, had as prescribed by the statutes, had resulted in a judgment against the relator, and the case had been removed by appeal to the circuit court where it was pending and undetermined at the time the application for mandamus was made. Prior to the recent amendment to the Constitution of this State which gave the District Court jurisdiction to try contests for office, the Supreme Court had held that the District Court had jurisdiction to entertain a suit for an office where the value thereof was sufficient to give the court jurisdiction of the amount, and that an information in the nature of a quo warranto filed by the State's counsel on the relation of the claimant of the office was a proper remedy. State ex rel. Jennett v. Owens, 63 Texas, 261. While no decision of the question since the adoption of the amendment of the Constitution and the enactment of the statute providing for election contests has come to our attention, yet there are a number of suits for office that have been brought and maintained in that way since then, notably the case of State ex rel. v. Connor, 86 Texas, 133. The right to hold a public office is a matter in which the people are concerned, and the remedy given to a candidate either to sue for the office or to contest the election in the manner prescribed by statute does not defeat the right of the State to inquire into it, although at the relation of the person who is claiming the election for the purpose of inducting himself into the office upon the ouster of the incumbent. The distinction between mandamus in the case cited and quo warranto for the purpose of trying the right to an office is quite clear. Neither is the case of Guadalupe County v. Wilson County, 58 Texas, 230, applicable, since the Legislature has prescribed a specific method by which the boundary lines between counties must be determined. But in support of the demurrer the appellant relies mainly upon the failure of the petition to allege fraud with reference to the official returns, because only for fraud could the returns be set aside and resort had to the ballots as secondary evidence. There were other allegations in the petition with regard to illegal voters who were alleged to have voted for the respondent in sufficient numbers to have changed the result of the election. These allegations were sufficient to sustain the petition, even if the others were insufficient to authorize the introduction of the ballots in evidence. The averments with respect to returns as to each of wards 2 and 3 were substantially that the returns were false, deceptive, and misleading, and that a fair, correct, and true count, tally, and return of the votes as they were actually cast would show a much smaller vote for the respondent, with the addition as to ward 3 that one of the officers was so excessively drunk that he could not perform his duties and

did not tally certain votes cast for the relator. We think these aver-ments, in the absence of a special exception, were sufficient to give the re-lator the right to controvert the returns by the introduction of the ballots themselves. It having been alleged that the returns were false and showed a much smaller vote for respondent than he had received, it was unnecessary to allege that the officers of the election had acted fraud-ulently in making them, for the injury to the relator would have been the same, and the ballots if they came from proper custody were admissi-ble as primary evidence of the result to controvert the returns. State ex rel. Jennett v. Owens, 63 Texas, 261; same case, 64 Texas, 500; Hunni-cut v. State, 75 Texas, 233; People v. Livingston, 79 N. Y., 279; Hud-son v. Solomon, 19 Kan., 177; 6 Am. and Eng. Enc. of Law, 424.

It is contended, however, that the law makes no provision for the pre-servation of the ballots, and that consequently they can not be admitted in evidence. The city of Beaumont is incorporated under the general law, which makes very general provisions with regard to elections and none as to the preservation of ballots. But there are provisions in the general election law of the State that show that it applies to all elections, munici-pal, county, and State. The State law (Revised Statutes, article 1729) provides that in all city, town, and village elections, where not otherwise provided for by the charter, the mayor shall order such elections, give notice thereof, and appoint presiding officers, who shall make returns to the mayor, under the same regulations, and with like effect, as in county elections so far as applicable. Article 1734 prescribes the qualification of voters at city, town, and village elections; article 1792 permits cities con-taining a population of 10,000 inhabitants or more to adopt such methods to protect the purity of the ballot in elections held in their municipal limits, not inconsistent with the provisions of the chapter relating to the manner of holding elections in such cities, as may be deemed ad-visable; and finally, by article 1810 the provisions of the law are made to apply to all elections, whether for officers or other purposes, where not otherwise provided by law. The general law requires the ballots to be preserved and prescribes the manner of preservation and the custody thereof, and that they shall be kept for one year for use in any contest that may grow out of the election. Rev. Stats., arts. 1747, 1748. They are required to be delivered to the county clerk for keeping, and just here some difficulty arises as to the officer the ballots in a city election should be delivered to. By analogy, perhaps, they should be delivered to the city clerk, but the Legislature may have required them to be delivered to the county clerk. It is contended that as a prerequisite to the introduc-tion of the ballots in evidence, the petition should have alleged that they had been preserved in a custody prescribed by law, but we are of the opin-ion that the petition in this respect was sufficient on general demurrer.

But the question of the admissibility of the ballots in evidence without their having come from a custody prescribed by law is raised by the fifth assignment of error. We are of the opinion that the provisions of the statute make them admissible as primary evidence to controvert the re-

turns, and that the fact that the statute has failed to prescribe a custody for them, but in that respect being uncertain, should not destroy them as evidence, if it be shown when they are offered that they have been preserved inviolate in some safe custody. When they come from the custody prescribed by law in obedience to a writ from proper authority and are produced in court apparently intact, they are prima facie admissible; but when they come from a custody that has not been prescribed by law, the burden is upon the party seeking to introduce them in evidence to show that they have been safely preserved and remain intact as they were when they left the hands of the presiding officer of the election. Owens v. State, 64 Texas, 500; Hunnicut v. State, 75 Texas, 420; Hudson v. Solomon, 19 Kan., 177; People v. Livingston, 79 N. Y., 279; 6 Am. and Eng. Enc. of Law, p. 424, par. 8. This burden the relator has met fully. It was shown that at each poll the ballots, when they had been counted, were fastened up in a box, and that over the aperture through which they were originally deposited a piece of paper was sealed with the name of the presiding officer written across the paper; that they were delivered by the presiding officer to the mayor, and by that officer deposited in the vault of a bank. The mayor and the officers and employes of the bank were introduced as witnesses and testified to the safe custody of the boxes; and they were produced in court to all appearances intact. After they were opened and when they were counted in the presence of the jury nothing appeared to give any reason to believe that they had been in anywise tampered with. No custody, it seems to us, would have been apt to be safer, certainly not that prescribed by law for State and county elections.

In submitting the case to the jury, however, the court instructed them that the recount of the ballots showed that the relator had received 554 votes, that the respondent had received 558 votes, and that in reaching their conclusion they should adopt these figures as a basis and deduct therefrom the illegal votes, if any, cast for the parties respectively. Unless the evidence was uncontroverted that the ballots had been safely preserved and had not been tampered with, this instruction was erroneous, because the question whether they were intact and the identical ballots cast by the voters and ought to be received to controvert the returns, was one of fact to be submitted to the jury. But we are of the opinion that the evidence in support of the identity of the ballots was uncontroverted and authorized the court to assume the fact in the submission of the case to the jury. The result of the count made in the presence of the court and jury was a mathematical computation and could be submitted as an ascertained fact.

From the bill of exceptions to the actions of the court below requiring the appellant to strike the jury from an incomplete panel and to accept certain talesmen, it appears that the original panel of jurors had been drawn and the names of the jurors placed upon the list and that the panel thus drawn did not contain the names of twenty-four jurors, but it did not appear that there were less than twelve names drawn. After the

parties had struck from the list the names of those challenged peremptorily there lacked four names to complete the jury, whereupon talesmen were summoned and the appellant was compelled, after having exhausted his peremptory challenges, to accept four jurors whom he challenged for cause as members of a political club organized to defeat the ticket the respondent ran on as candidate for city marshal. The jury was formed in exact compliance with the statute. Rev. Stats., arts. 3218, 3219; Railway v. Greenlee, 70 Texas, 553. It was not a ground of challenge for cause that the jurors belonged to an opposing political party or voted against the respondent.

For the purpose of identifying the ballot of a voter in case his right to vote has been successfully impeached in a contest of the election and to prevent fraudulent voting, the statute requires poll lists to be kept upon which the name and number of the voter must be written, and the ballot cast to have written upon it the voter's number corresponding with the number on the poll list (Rev. Stats., art. 1738), and prohibits any ballot which is not numbered as required from being counted. Rev. Stats., art. 1741. This article has been held to be mandatory. State v. Connor, supra. In order to entitle them to be counted, then, it would seem that the ballots should not only have thereon a number, but that the number should correspond to the voter's number on the poll list. But the bill of exceptions to the action of the court in allowing the duplicate ballots numbered 14, 19, and 35 to be counted does not show that these numbers did not correspond to the same numbers upon the poll list, and therefore does not bring them within the prohibition of the statute. It is true that where there are two ballots having the same number corresponding to the numbers of two voters on the poll lists having the same numbers that appear upon the ballots, there would be an uncertainty as to whom either of the voters cast his ballot for. The statute will not be extended, however, to cover a case not included within the terms of its prohibition.

Appellant objected to the introduction in evidence of the original minutes of the city council of the city of Beaumont to prove the declaration of the city council with reference to the result of the election, and the salary attached to the office of city marshal, because the records could only be shown by certified copies. Under the statute certified copies are admissible only where the record itself would be admissible. Rev. Stats., art. 2306; Glen v. Ashcroft, 2 Posey, 448; Evitts v. Roth, 61 Texas, 81. The original minutes were objected to only upon the ground that they should be proved by certified copies. The objection is without merit. Hardin v. Blackshear, 60 Texas, 132. But the ruling was immaterial, because the original returns of the election were before the court and the declaration of the result by the city council a conceded fact; and it was not necessary to prove that the salary of the marshal exceeded $500 in order to give the court jurisdiction, for it had jurisdiction regardless of the amount in controversy. Dean v. State, 88 Texas, 290.

The relator was allowed to prove by a witness introduced in his behalf the declaration of Charles Scott, who voted for the respondent, and was

alleged to be an illegal voter, that he came from Lake Charles, La.  The respondent objected that the declaration was not admissible to impeach the vote of the person making it, and that it was not the best evidence as to his residence.  If there was error in the admission of this evidence it was immaterial and harmless, because it appears from the rest of the testimony of the witness that Scott had resided in Beaumont for only a month or two prior to the election.  It was immaterial where he came from.  Davis v. State, 75 Texas, 428.

Appellant complains of the judgment entry in the particular that it adjudges the office to the relator "together with all its franchises, privileges, and the emoluments thereof," when only the right to the office was in issue.  We fail to see any merit in this objection.  The office carries with it the rights, franchises, and emoluments thereof.

There being no error in the judgment of the court below, it will be affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

Pending the motion for rehearing in this case this court certified to the Supreme Court for decision the controlling questions raised on the hearing thereof.  The decision of the Supreme Court, delivered January 23, 1899, sustains this court in the conclusions reached by it.  The appellant's motion for a rehearing will be overruled.

*Overruled.*