## RAMSAY v. WILHELM.
### No. 7718.

Court of Civil Appeals of Texas. Austin.
June 1, 1932.

Rehearing Denied July 13, 1932.

T. G. Oliver, Jr., and Will G. Barber, both of San Marcos, for appellant.

Smith, Brownlee & Goldsmith, of Austin, and T. C. Johnson, Jr., of San Marcos, for appellee.

BAUGH, J.

Suit by Wilhelm against Ramsay for the office of mayor of San Marcos on the ground that he had received a majority of the legal votes cast at the election of April 7, 1931. The returns of the election showed Ramsay 434 votes; Wilhelm 430. Ramsay was declared elected and qualified on April 21, 1931. Wilhelm's pleadings alleged, among other things, that certain voters, naming them, voted for Ramsay whose votes were illegal for the following reasons: Because 24 were aliens; 5 had failed to pay poll taxes due in Hays county; 5 had not resided in the city six months next prior to the election; 3 had not paid their poll taxes due by them in other counties; 1 was a minor at the time; and 8 were conveyed to the voting places by Ramsay, aggregating 46 illegal votes alleged to have been cast for Ramsay.

Appellant, Ramsay, in turn, attacked 21 votes cast for Wilhelm as illegal because 1 of said voters was an alien; 7 had failed to pay poll taxes due by them in Hays county; 3 did not receive their poll tax receipts until July 18, 1931; 3 did not present poll tax receipts nor make the required affidavit when voting; 3 who were not subject to payment of poll tax voted absentee; and 4 who voted absentee votes did not comply with article 2956, R. S. 1925. Appellant, Ramsay, further alleged that, in Ward No. 1, 207 qualified electors cast their ballots, not more than 5 per cent. of whom presented poll tax receipts or made necessary affidavits required by articles 3004 and 3005, R. S., whose names and ballot choices were unknown to him; that Wilhelm loitered in and around said polling place during said election and electioneered within 100 feet of the polls; and that the ballot box for that ward had been exposed to interference after the polls closed.

Both parties also attacked certain votes as illegal because not numbered or not signed by the judge of the election. At the close of the evidence, the trial court instructed a verdict in favor of Wilhelm, and rendered judgment in his favor for the office and for the amount of the emoluments of said office from April 21, 1931; from which judgment this appeal is prosecuted.

Appellant's first contention is that the trial court erred in causing the ballot boxes to be opened and the challenged ballots to be offered in evidence because: (1) The evidence showed that the ballots had been exposed to continued opportunity for interference or tampering with; (2) the ballots, after the polls closed and the votes had been counted, not having been in the possession of a legal custodian, it was incumbent upon Wilhelm to fully identify them as those cast, to show that they had been carefully preserved, had not been exposed to interference, and that they were in the same condition as they were when cast; (3) that, even if in proper legal custody, they were so exposed to interference as to destroy any prima facie presumption of their integrity and render them inadmissible on that ground.

■ While the statutes are not entirely clear as to what officer, in an election for mayor, is the proper custodian of the ballots after same have been canvassed, under articles 2997, 3026, and 3028 it appears that the city secretary was the proper custodian in the instant case. Their removal from his custody into that of the district clerk was at the instance of the appellant himself, and of this he is in no position to complain. Under the view we take of the case, we deem it unnecessary to state all the facts surrounding their custody from the time the polls closed up to the time (about one week) they were delivered to the district clerk.

■■ Appellant has cited us to numerous cases sustaining the propositions made, all but one of which are from other states. It has been universally held that the ballots themselves, unless tampered with or changed, are the best evidence of the will of the electorate, regardless of what the returns may show, when such returns are properly called in question. But, when resort is had to a recount of the ballots to impeach or contradict the returns, the burden is upon the complainant to show that the ballots are genuine, that they have not been tampered with, that they have been carefully preserved, and have not been exposed to the interference of interested parties. The mere possibility of interference, however, or absent any reasonable indication of interference, or opportunity to do so, should not exclude them as evidence. A mere suspicion is not sufficient to do so. See Gray v. State, 92 Tex. 396, 49 S. W. 217, 218; Id., 19 Tex. Civ. App. 521, 49 S. W. 699; Davis v. State, 75 Tex. 420, 12 S. W. 957; Henderson v. Albright, 12 Tex. Civ. App. 368, 34 S. W. 992; 16 Tex. Jur. 184; Hamilton v. Young (Ky.) 81 S. W. 682, 683; Stokely v. Burke, 130 Tenn. 219, 169 S. W. 763, Ann. Cas. 1916B, 488; Jeter v. Headley, 186 Ill. 35, 57 N. E. 784; Farrell v. Larsen, 26 Utah, 283, 73 P. 227; note 2 L. R. A. 596; Rottner v. Buchner, 260 Ill. 475, 103 N. E. 454; Hicks v. Kimbro, 210 Ky. 265, 275 S. W. 814; McCray on Elections, § 471.

■ The election statutes in this state (title 50 R. S. 1925) comprise 251 articles which have frequently been amended by the Legislature (Vernon's Ann. Civ. St. art. 2923, et

seq.), and regulate at length the manner of holding elections and disposition of the returns. It is common knowledge that such matters are usually intrusted to laymen, and that in sparsely populated counties and small towns a strict compliance with all the provisions of the statutes is seldom, if ever, observed. The will of the legal voters as expressed at the polls is the matter of paramount concern, and, in the absence any showing of fraud, or reasonable indication that such will has not been fairly expressed and the evidence thereof properly preserved, the courts have been liberal in construing and enforcing as directory only the provisions of the election laws which are not upon their face clearly mandatory.

In the instant case, no effort was made to impeach the returns of the election by the ballots themselves; that is, there is no contention that the ballots cast were not properly counted, nor that the returns do not truly reflect the results of such votes. On this issue the suit was pleaded and tried on the allegations, not that the votes were not properly counted, nor that any fraud had been perpetrated or votes tampered with after being cast; but that certain votes admittedly cast as shown by the returns were themselves illegal. Under these circumstances, we think that the ballots, absent any evidence that any fraud was perpetrated, or that either the ballots or the returns were in any manner tampered with, were properly admitted in evidence.

Appellant's next contention relates to the conduct of appellee in and about two of the voting places. The excluded testimony shows that he was seen several times at and near the voting place in ward No. 1, during the day, and at least once within 100 feet of the voting place in ward No. 4. While this is forbidden by the statute (articles 3012, 3014, and 3024, R. S., and P. C. art. 259), we find nothing in said testimony to show that appellee in fact electioneered with any one, or in any manner influenced or sought to influence the vote of any elector, or prevented the free and untrammeled choice of any elector, or was guilty of any fraud in connection with such election, or that his conduct in any manner caused an unfair election. However subject to criticism his conduct may have been, unless there be some reasonable indication that it prevented or influenced the fairness of the election or the vote of the people thereat, or affected their choice, the courts will not set aside the result and place the burden and expense of holding another election upon the community because of such conduct of the candidate or the failure of the election officials to follow the directory provisions of the statute. It may be, as suggested by appellant, that the courts have gone far in not allowing violations of the statute to vitiate an election; but, where the sanctity of the ballot

has not been violated, and a fair expression of the will of the voters has been had, the courts of this state have uniformly construed such statutes as directory only; and have been liberal in their application to effectuate the will of the electorate. Nowhere do we find any provisions in the statute which would authorize a rejection of legal votes or refusal to give them effect because of misconduct of a candidate, not affecting the holding of the election nor the result thereof, nor indicating any probability that the fairness of the election or the choice of the electorate was in any manner influenced or affected thereby. We find no evidence of any such result from the conduct of appellee in this case as shown by the evidence offered. The record discloses that both candidates failed to observe some of the provisions of chapter 8 of title 50 (article 2998 et seq.), regulating the conduct of the election; but it is clear, we think, that such violations were due to zeal, were not intentional wrongdoing, and afford no proof that an unfair election was the result, or that any fraud was committed, or that the will of the electorate was in any way affected.

Appellant's fourth contention, which we next consider and upon which he chiefly relies for reversal, relates to the exclusion of evidence offered under his pleading that in ward No. 1 at least 95 per cent. of 207 legally qualified electors, who had paid their poll taxes, were permitted to vote without presenting their poll tax receipts or making affidavit as to loss, etc., provided for in article 3004, R. S.; and that all such votes so cast were therefore illegal. No effort was made to name or identify such voters. On the contrary, it was shown that it was impossible to ascertain who these voters were. It may be doubted whether the pleadings or the proof offered were sufficient to raise the issue of the legality of the votes so attacked. See Davis v. Harper, 17 Tex. Civ. App. 88, 42 S. W. 788. If, however, the pleadings be deemed sufficient, it was not error to exclude the proffered evidence. The real question presented is whether the failure of the voter, who had paid his poll tax prior to February 1st, to present same or make the required affidavit, without demand by the election officials that he do so, disqualifies him to vote and renders his ballot so cast illegal. We do not think so. Article 3004 provides in part that: "No citizen shall be permitted to vote, unless he first presents to the judge of election his poll tax receipt or certificate of exemption issued to him before the first day of February of the year in which he offers to vote," etc.; or unless he makes the affidavit in said article prescribed.

Appellant insists that, because this article is negative, it is mandatory, and imposes an affirmative duty upon the voter himself to comply with it; and that his failure to

do so invalidates his ballot. We do not so construe this statute. Qualifications of the voter are prescribed and defined in article 6, §§ 2 and 3, of the Constitution, and by chapter 5 of title 50, R. S. (article 2954 et seq. as amended). The Constitution itself defines the qualifications of a legal voter, and the Legislature is without power to restrict or extend these requirements. Cameron v. Connally, 117 Tex. 159, 299 S. W. 221. Appellant's pleadings show that the voters in question had met the constitutional requirements by obtaining their poll tax receipts prior to February 1st. If it had been demanded of them by the election officials, they could have shown their undenied right to vote under the Constitution and laws. And the failure of these officials to perform their duties should not be permitted to disfranchise a legal voter. Fowler v. State, 68 Tex. 35, 3 S. W. 255; Roberts v. Epperson (Tex. Civ. App.) 288 S. W. 595; Leslie v. Griffin (Tex. Civ. App.) 23 S.W.(2d) 535. In the last-named case we held that the provisions of article 3004 were for the guidance of the election judges in testing the qualifications of a voter. Chapter 8 of title 50, R. S., relates to the manner and form of holding an election, and does not purport to define qualifications of voters, as does chapter 5 of said title. And, absent evidence of fraud, unfairness in the holding of an election, or tampering with the ballots or returns, the courts of this state have uniformly held that ballots cast by legally qualified voters should be given effect, though election officials had failed to discharge their duties as prescribed by statute, unless there is clear provision in the statute itself that such ballots shall not be counted. Article 3143, R. S.; State v. Logan (Tex. Civ. App.) 5 S.W.(2d) 247, 251; Hooker v. Foster (Tex. Civ. App.) 19 S.W.(2d) 911; Leslie v. Griffin, supra; Savage v. Umphries (Tex. Civ. App.) 118 S. W. 893, 901; Bass v. Lawrence (Tex. Civ. App.) 300 S. W. 207; 16 Tex. Jur. 14. We find no such provision with reference to votes cast by qualified electors when the provisions of said article 3004 have not been complied with by the election officials.

This liberal policy, uniformly adhered to, was announced by Judge Gaines in Davis v. State, 75 Tex. 420, 432, 12 S. W. 957, 962, in the following language: "The main design of all election laws is, or should be, to secure a fair expression of the popular will, in the speediest and most convenient manner; and we think a failure to comply with provisions not essential to attain that object should not avoid the election, in the absence of language clearly showing that such was the legislative intent."

The Legislature has with particularity thrown numerous safeguards around the suffrage of the citizenship; and the manner, form, time, and place of its exercise. Of necessity, the holding of such elections are and must be intrusted to those not always conversant with the numerous provisions of the law regulating same. As a result, all of such provisions are seldom complied with in every particular. But it is equally true that such failures on the part of election officials seldom defeat a fair expression of the popular will. Where they do not, the courts have been liberal in sustaining the result. Turner v. Teller (Tex. Civ. App.) 275 S. W. 115. Where such derelictions of the election officials have interfered with or prevented such a fair expression, or where there is any reasonable indication that such was the result, the courts have set them aside. But to enforce a strict observance of all of the directory provisions of the statute, absent proof of unfairness or dishonesty, would more often defeat than effectuate the popular will; and it is probable that but few elections would stand such a scrupulous test.

■ We next consider the legality of the votes attacked by both parties. An examination of the ballots upon the trial disclosed that 26 ballots either were not numbered, had not been signed by the presiding judge, or had the presiding judge's name signed thereon by another. Of this number 15 voted for Ramsay and 11 for Wilhelm. Article 3018, R. S., expressly provides that such ballots shall not be counted; and these provisions have been held to be mandatory. Miller v. Coffee, 118 Tex. 381, 15 S.W.(2d) 1036; Turner v. Teller, supra; State v. Connor, 86 Tex. 133, 23 S. W. 1103; Walker v. Mobley (Tex. Civ. App.) 105 S. W. 61; 16 Tex. Jur. § 104, p. 122. Deducting these votes from the returns shows a total remaining for each candidate of 419 votes.

■ Considering now the votes cast for Ramsay attacked as illegal, the record discloses the following: 18 Mexicans voted for Ramsay who were born in Mexico, whose parents were shown to have been citizens of Mexico, and who had never been naturalized. Appellant insists that, having been allowed to vote, it must be presumed that the election officials found them qualified, and that to disfranchise them appellee must show clearly and conclusively that they were disqualified.

The general rule announced in 2 C. J. 1045, is that: "Foreigners by birth are presumed to be aliens. The status of a person as to alienage, when once established, is presumed to continue until the contrary is proved." The proof made, therefore, was sufficient to establish, prima facie, that these voters were aliens, and no attempt was made to prove the contrary. All of these votes should have been excluded. Huff v. Duffield (Tex. Civ. App.) 251 S. W. 298; McCharen v. Mead (Tex. Civ. App.) 275 S. W. 117, 123.

One Mexican voter, who was also an alien,

was shown to be a minor at the time of the election.

One voter, born in Greece of alien parentage, had not been naturalized.

Another Mexican, in addition to being an alien, could not speak English, and an election judge made out his ticket for him under instructions obtained through an interpreter. This was in contravention of article 3010, R. S., which expressly forbids that such vote be counted. In addition, his vote should be excluded because he was shown to have been an alien.

Four voters were shown to have voted who had not paid poll taxes due by them for the year 1930.

One voter was shown to have lived outside of the city limits at the time he voted.

Two voters were shown to have moved to San Marcos on November 30, 1930, from Wimberly, and had not therefore been residents of the city for a period of six months when they voted at said election on April 7, 1931.

One voter had moved to San Marcos from Hill county in June, 1930, and admittedly had not paid the poll tax assessed against him in Hill county for the year 1930.

All of the above indicated votes were cast for Ramsay. There can be no doubt, we think, but that the foregoing 28 votes were illegal and should be deducted from the 419 votes left to Ramsay after those admittedly illegal had already been deducted, leaving to Ramsay a total of 391 votes.

We do not deem it necessary to consider in detail all the votes cast for Wilhelm attacked by Ramsay as being illegal. Undoubtedly, we think some of them were legal ballots and were properly counted. While there was evidence that Wilhelm had conveyed some voters to the polls in his own car, it appears that Ramsay was guilty of similar conduct. Obviously article 3025 prohibiting such practice was not intended to prevent any one from conveying his friends or neighbors to the polls. The article was aimed at a prevention of what had developed into a vicious system of candidates in operating such conveyances for that purpose, thus seeking to influence the voters. See Coward v. Williams (Tex. Civ. App.) 4 S.W.(2d) 249. Nowhere do we find any provision or intimation in the statute that any vote cast, where said article of the statute was violated, should not be counted for that reason.

The votes of 7 absentee voters were also attacked. Two of these were exempt from payment of poll taxes, and in cities of less than 10,000 inhabitants no exemption certificate as a prerequisite to voting is required. Five others held their poll tax receipts showing payment prior to February 1, 1931, but did not deliver them nor exhibit them to the county clerk when obtaining their ballots, as provided for in article 2956, R. S. No such demand was made of them by the county clerk. That these voters were qualified voters is admitted. That they expressed their will by an otherwise legal ballot, that such ballot was not tampered with, but was counted, is not denied. The proper time and place to have raised that question would have been, we think, by challenge of these votes when tendered to the election officials, as provided for in article 2956. There is no indication that this was done. It may be admitted that in casting absentee ballots every precaution as provided for in the statute should be taken to prevent fraud or illegal voting; and, should there appear any reasonable doubt as to the legality of such votes, or had they been excluded by the election officials, any doubt as to their legality should be resolved in favor of preservation of the purity of the ballot. But where, as here, it affirmatively appears that the electors in question were legally qualified voters, entitled under the law to cast their ballots, had expressed in such ballot their untrammeled choice, and their will had been truly given effect by the returns of the election, the purposes of the election laws have been accomplished; and we decline to disfranchise them, because administrative officials have failed, obviously inadvertently, to discharge the ministerial duties imposed upon them by the statute.

But, if it be conceded that all of the 21 ballots attacked were illegal on the grounds alleged, and all of them be deducted from the 419 votes remaining for Wilhelm after deducting the 11 admittedly illegal because not properly signed or numbered, there still remains accredited to Wilhelm a total of 398 votes, 7 more than received by Ramsay. Under such circumstances, we think the trial court properly instructed the jury to find that Wilhelm was duly elected to the office of mayor of the town of San Marcos.

Appellant next complains of the action of the trial court in rendering a money judgment against him for the sum of $332, as the amount of the salary of said office from the date Ramsay qualified up to the date of the trial.

The right of a de jure officer to recover from a de facto officer, who fills the office to which the former is entitled, the emoluments thereof collected by the latter during his incumbency, appears now to be well settled. State v. McAllister (Tex. Civ. App.) 31 S. W. 679; Pease v. State (Tex. Civ. App.) 155 S. W. 657; same case by Supreme Court 208 S. W. 162; Holcomb v. Spikes (Tex. Civ. App.) 249 S. W. 516, 517. The instant suit was twofold: First, to recover the office itself; and, second, to recover a personal judgment against Ramsay for the emoluments thereof collected by him. It is obvious that, if Ramsay had not

collected any salary during that period, whether for lack of funds in the city treasury to pay him, or his unwillingness to do so, because his right to the office was being questioned, no money judgment against him would be authorized. And the burden was upon Wilhelm to show payment of salary to Ramsay during the latter's incumbency in the office. A mere showing that he occupied the office, the amount of the salary, and that it was payable monthly does not constitute such proof. There was no proof as to how much, if anything, Ramsay had actually received from the city as salary since he took the oath of office as mayor. The exact point here raised was, we think, expressly disposed of by the Commission of Appeals in Pease v. State, 208 S. W. 162, 163, and we pretermit a further discussion of it here.

The judgment of the trial court in so far as it awarded to J. R. Wilhelm title and possession of the office of mayor of the city of San Marcos is affirmed. In so far as it awarded him a money judgment against Ramsay, it is reversed, and the cause remanded.

Affirmed in part, and in part reversed and remanded.