Des Champ 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-94-285-CV





L. T. DES CHAMP,



 
 APPELLANT


vs.





BILLY R. FEATHERSTON,



 APPELLEE



 




FROM THE DISTRICT COURT OF LLANO COUNTY, 33RD JUDICIAL DISTRICT



 NO. 10-332, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING



 




PER CURIAM

 Appellant L. T. Des Champ filed an election contest challenging the outcome of
the runoff election held on April 12, 1994, for the Democratic nomination for County Judge of
Llano County, Texas. The district court rendered judgment upholding the election and declaring
appellee Billy R. Featherston the winner. We will affirm the trial-court judgment.



BACKGROUND


 This case involves the April 12, 1994, runoff election for the Democratic
nomination for County Judge of Llano County between Des Champ and Featherston. The initial
canvas of votes revealed that Des Champ won the election by two votes--929 to 927. Featherston
then requested a recount, and the official election result after the recount showed that the election
was tied 929 to 929. Pursuant to the mandate of the Election Code, the candidates drew lots. See
Tex. Elec. Code Ann. § 2.028 (West 1986). Upon winning the draw, Featherston was declared
the winner of the election.

 Des Champ timely perfected a statutory election contest. Tex. Elec. Code Ann.
§§ 232.001 - .050 (West 1986 & Supp. 1994). He alleged a number of election irregularities,
including movement of a polling place in violation of the Texas Election Code and Section 5 of
the Voting Rights Act of 1965, casting of illegal votes, and failure to secure the ballots cast in the
runoff as required by the Election Code. Following a nonjury trial, the district court rendered
judgment in favor of Featherston. The court found that Des Champ failed to prove that any of
the alleged irregularities affected the outcome of the runoff election. It further determined that
five people who had voted in the election, three of whom had voted for Des Champ and two for
Featherston, were ineligible to vote. (1) The court thus found the true outcome of the election to be
927 votes for Featherston and 926 votes for Des Champ.



DISCUSSION


 In his appeal, Des Champ raises three points of error. He claims that the trial court
erred: (1) in upholding the result of the runoff election because the movement of a polling place
on the election day rendered the entire election void; (2) in failing to consider Section 5 of the
Voting Rights Act of 1965, 42 U.S.C. § 1973c, as a collateral matter in resolving the election
contest; and (3) in upholding the outcome of the runoff election because numerous other
irregularities rendered the true result of the election improbable or impossible to ascertain.

 We begin by addressing Des Champ's first point of error, which compels us to
determine whether the trial court erred in not ordering a new election because the movement of
the polling place for precinct number three rendered the election void. The Democratic primary
had long been held in the Volunteer Fire Department building (the "Volunteer building"), and the
notices for the primary and the runoff election stated that each election would be held in that
building. However, on the morning of the election, precinct chairman Harold Steadman moved
the polling place from the Volunteer building to the nearby Red Barn Community Center (the
"Red Barn"). Des Champ asserts that this change prevented some individuals from voting.

 Election Code provisions fall into two categories: mandatory and directory. To
set aside an election for a violation of a mandatory provision, the contestant must prove only that
a violation occurred. With few exceptions, such a violation results in the automatic invalidation
of the election. To set aside an election for a violation of a directory provision, however, the
contestant must prove both that a violation occurred and that the irregularity affected the outcome
of the election. See Branaum v. Patrick, 643 S.W.2d 745, 749-50 (Tex. App.--San Antonio 1982,
no writ). Des Champ asserts that Election Code provisions governing the time and place of
elections are mandatory and, consequently, any violation of these provisions automatically voids
the election as a matter of law. The moving of the polling place for precinct three did violate the
Election Code, as even Featherston concedes. See Tex. Elec. Code § 43.003 (West 1986). Our
task is to determine whether provisions concerning the designation of a polling place are always
mandatory and, further, to decide if the violation of the polling place provision in precinct three
requires this Court to void the entire election.

 Courts liberally construe Election Code provisions not clearly mandatory on their
face as directory only. Ramsay v. Wilheim, 52 S.W.2d 757, 759 (Tex. Civ. App.--Austin 1932,
writ ref'd). However, "[p]rovisions regulating the time and place for holding elections are usually
mandatory." Davis v. State, 12 S.W. 957, 961 (Tex. 1889) (emphasis added); see also Branaum,
643 S.W.2d at 750 (stating in dicta that provisions setting the day and place of an election are
usually mandatory); Shrader v. Ritchey, 306 S.W.2d 808, 809 (Tex. Civ. App.--Beaumont 1957)
(declaring that place and time provisions are mandatory), on certificate, 309 S.W.2d 812 (Tex.
1958); Clark v. Stubbs, 131 S.W.2d 663, 667 (Tex. Civ. App.--Austin 1939, no writ) (holding that
"[t]he time and place for holding elections are usually regarded as mandatory); Coffee v. Lieb, 107
S.W.2d 406, 410-11 (Tex. Civ. App.--Eastland 1937, no writ) (determining that place and notice
provisions for special elections are mandatory); Gray v. Ingleside Indep. Sch. Dist., 220 S.W.
350, 351 (Tex. Civ. App.--Fort Worth 1920, writ dism'd) (noting in dicta that place provisions
are mandatory).

 We therefore assume, without deciding the issue, that provisions governing the time
and place for holding elections are mandatory. However, this assumption does not resolve the
issue of whether a violation of such a provision requires a court to void the entire election. Courts
have recognized that the policy behind time and place provisions dictates that violations should
not always result in the voiding of an election. See, e.g., May v. State, 63 S.W. 132, 133 (Tex.
Crim. App. 1901); Ex Parte Segars, 25 S.W. 26, 27 (Tex. Crim. App. 1894). Even Des Champ
concedes that a violation of a mandatory provision should not always result in the voiding of an
election, identifying three categories of exceptions in which time and place provisions are not
mandatory: (1) the collateral attack exception, which disallows an attack on an election through
any means other than an election contest; (2) the de minimus exception, which enables a court to
uphold an election in spite of a minor move that does not affect the election outcome; and (3) the
prescription exception, which allows the establishment of a new voting location by prescription. 
For present purposes, we need examine only the second exception.

 The Texas Supreme Court has explained the policy underlying time and place
provisions: "It is of the essence of a fair election that a time should be fixed and a place appointed
where each qualified voter may cast his ballot or give his vote." Davis, 12 S.W. at 961. The
Court of Criminal Appeals used a similar rationale to explain the de minimus exception:



The object of a provision of this character is to insure a fair and honest election,
by requiring each voter to cast his ballot at the same place where his neighbor
voted, and those to whom his qualifications were best known and by whom, if
necessary, they could be challenged. . . . Elections are the ultimate expression of
the sovereign will. When fairly expressed,--that is, free from taint of fraud or
charge of improper conduct,--it becomes the duty of courts to sustain them, where
it can be done by a liberal construction of the laws relating to elections, rather
than defeat them by requiring rigid conformity to law. The great public purposes
which are accomplished by elections demand this.



Ex Parte White, 28 S.W. 542, 544 (Tex. Crim. App. 1894) (emphasis added). The court thus
determined that a change in polling place across the hallway of the courthouse to another room
was insufficient to void the election; the distance was very small, and voters knew where the poll
was. Id. In a case decided the same year, the court determined that moving the poll to another
street two blocks away did not represent sufficient grounds for voiding the election. The court
held:



It does not appear that there has not been a fair expression of the will of the
people. . . . It does not appear that any voter was deprived of his vote, nor was
the change attributed to any fraudulent or improper motive, nor does it appear that
the change was not known and concurred in by all the voters in ward 2. Indeed,
. . . we find that a larger proportionate vote was cast in ward 2 than in the other
wards . . . .



Ex Parte Segars, 25 S.W. at 27; see also May, 63 S.W. at 133 (recognizing an exception to the
general rule that place provisions are mandatory when changes in location are only slight and
"were rendered necessary by some supervening cause"); Roper v. Scurlock, 69 S.W. 456, 458
(Tex. Civ. App. 1902) (deciding that a changed polling place only 125 feet and within plain view
of the designated polling place was not grounds for voiding the election), appeal dismissed, 193
U.S. 675 (1904).

 We will proceed to consider whether the precinct three move falls within the de
minimus exception. The polling place was moved across a parking lot from the Volunteer
building to the Red Barn, a location in plain view of the designated polling place. Testimony
established that at least one sign directed people to the new polling site. Des Champ argues that
people were confused and did not vote because of the move. He complains that instead of using
the door to the Red Barn located directly across from the Volunteer building and readily visible
from that building, Steadman used a back entrance that could not be seen from the Volunteer
building and that opened into a barbecue pit area. However, the uncontroverted facts confirm that
not a single voter was actually prevented from voting. (2) In fact, the evidence establishes that the
turnout in precinct three was higher than all but one other precinct, and almost twenty percent
higher than the precinct three turnout had been in the primary election. Des Champ suggests that
Steadman moved the polling place because he was a friend and supporter of Featherston. 
Steadman testified at his deposition that he was not an active supporter of either runoff candidate;
while he had signed and distributed petitions for Featherston, he also signed a letter for Des
Champ and authorized him to include the letter in a campaign brochure. When asked why he
moved the polling location to the Red Barn, Steadman explained that the Republicans ordinarily
used the Red Barn during primary elections, and it was therefore usually unavailable for
Democratic primaries. Because the facility proved available the morning of the runoff election,
he decided to move the polling place to the larger, more comfortable location across the parking
lot. (3) We conclude that the change in the polling location of precinct three, though a technical
violation of the Election Code, was a de minimus change. Under these circumstances, it would
frustrate the democratic process to void this entire runoff election for the sake of rigid conformity
to the law. Therefore, we overrule Des Champ's first point of error.

 The result would be the same if we concluded that the Election Code provision at
issue was merely directory. The trial court determined in its findings of fact and conclusions of
law that "there is no credible evidence that any voters were denied the right to vote by the moving
of the polling place in voting Precinct Number 3." (4) We attach to findings of fact the same weight
that we attach to a jury's verdict upon jury questions. City of Clute v. City of Lake Jackson, 559
S.W.2d 391, 395 (Tex. Civ. App.--Houston [14th Dist.] 1977, writ ref'd n.r.e.). Accordingly,
findings of fact are reviewable for legal and factual sufficiency of the evidence by the same
standards used to review jury findings. Okon v. Levy, 612 S.W.2d 938, 941 (Tex. Civ.
App.--Dallas 1981, writ ref'd n.r.e.) (citing Hall v. Villareal Dev. Corp., 522 S.W.2d 195 (Tex.
1975)). (5) When a court's findings of fact go unchallenged, such findings become undisputed facts
binding on all parties. James Holmes Enter., Inc. v. John Bankston Constr. & Equip. Rental,
Inc., 664 S.W.2d 832, 834 (Tex. App.--Beaumont 1983, writ ref'd n.r.e.); see also Tex. R. Civ.
P. 298. In the present case, the findings of fact are unchallenged and are, therefore, taken as true. 
Because Des Champ failed to prove that the violation affected the outcome of the election, he
failed to meet his burden of proof necessary for voiding the election.

 In his second point of error, Des Champ asserts that the trial court erred in failing
to consider Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1994), as a collateral
matter in determining the outcome of the election contest. He complains that Steadman, a precinct
chairman, moved the precinct three polling place in contravention of the Texas Election Code and
without preclearance from the United States Attorney General and that the chairman of the Llano
County Democratic Party, Roger Pinckney, moved the precinct eight polling place without
preclearance. Section 5 of the Act mandates that when a political subdivision covered by the Act
enacts or administers a new voting procedure, the political subdivision must either seek a
declaratory judgment in the United States District Court in the District of Columbia or submit the
procedure to the United States Attorney General for preclearance. 42 U.S.C. § 1973c.

 However, the "approval requirements of Section 5 apply only when a `state or
political subdivision shall enact or seek to administer' a change in its voting procedures." United
States v. Saint Landry Parish Sch. Bd., 601 F.2d 859, 863-64 (5th Cir. 1979) (quoting 42 U.S.C.
§ 1973c). The Fifth Circuit decided in Saint Landry Parish that while the isolated actions of three
poll commissioners in a vote-buying scheme could be viewed as a change in voting procedures
covered by Section 5, such actions did not constitute a change that the state "has enacted or sought
to administer" within the scope of the Act's approval provision. Id. at 864. The court explained:



 We do not dispute that the actions of the three poll commissioners constitute
actions of the state for certain purposes. . . . But one would not normally conclude
that a state "enacts or administers" a new voting procedure every time a state
official deviates from the state's required procedures. The commonsense meaning
of "shall enact" indicates that action of a state, as a body, is envisioned, and we
think "shall seek to . . . administer" was added to cover situations when an
enactment was not actually passed, but when a procedure was nonetheless widely
administered with at least the implicit approval of the state governing authority.


 . . . .


 . . . Surely Congress did not intend the Attorney General and the district
court for the District of Columbia to waste their time considering voting
procedures that a state does not wish to enact or administer. But this would be the
result if we required the state to submit for approval, as a new voting procedure,
those actions of state officials which conflict with the state's required procedures.



Id. (emphasis in original). The court further instructed that Section 5 was "not designed to
provide sanction for every fraudulent election. . . . [It] does not operate to discover and uncover
every artifact of political manipulation. . . . [It] does not possess a universality with respect to
every electoral aberration." Id. at 865.

 We thus dispose of Des Champ's second point of error without deciding the proper
role for state courts in the enforcement of the Voting Rights Act. The actions of neither Steadman
nor Pinckney constituted a procedure whereby the state enacted or administered a new voting
procedure. Their actions, instead, like the action of the three commissioners in Saint Landry
Parish, represent a deviation from the state's required procedures by individuals. (6) Accordingly,
Section 5 does not apply, and the trial court was correct in not considering Des Champ's Section
5 claims. We overrule Des Champ's second point of error.

 In his final point of error, Des Champ contends that the trial court erred in
upholding the runoff election because numerous other irregularities rendered the true result
impossible or improbable to ascertain. Des Champ has asserted a number of complaints: 
discrepancies in ballot tabulations of the total runoff votes cast; the failure to give the ballot-box
keys to the Llano County Sheriff as required by law and the placing of the keys in a drawer near
the ballot box; the retention of unused extra ballots in the County Clerk's office; the County
Clerk's failure to account for the number of ballots available for use during the runoff; the failure
of the election judge for precinct three to count the ballots he received; the absence of a paper seal
over the ballot-box slot when the box was brought in for the recount and the appearance of
tampering; and the attempts by Llano County officials to influence the election outcome.

 These violations implicate directory provisions of the Election Code. Mandatory
provisions are generally limited to provisions requiring elections to be held by ballot and to those
setting out voter qualifications as well as the time and place of elections. To set aside an election
for violation of directory provisions, the contestant must show that the irregularities prevented
voters from exercising freely and fairly their right to vote or from having their votes properly
counted; in the absence of such proof, such irregularities are treated as informalities that do not
void the election. See Branaum, 643 S.W.2d at 750; Shrader, 306 S.W.2d at 809-10; see also
Chumney v. Craig, 805 S.W.2d 864, 870 (Tex. App.--Waco 1991, writ denied) (holding that the
contestant has the burden of proving that the outcome of the election was not the true outcome
because of alleged irregularities); Ware v. Crystal City Indep. Sch. Dist., 489 S.W.2d 190, 191-92
(Tex. Civ. App.--San Antonio 1973, writ dism'd) ("The burden is on the contestant to allege and
prove either a different result would have been reached by counting or not counting specified
votes, or that irregularities . . . were such as to render it impossible to determine the will of the
majority of the voters participating.").

 According to the unchallenged findings of fact, which must be taken as true, Des
Champ failed to meet his burden of proof. The trial court, instead, found that "the irregularities
alleged by Contestant Des Champ to have occurred in the election process, singularly or in the
aggregate, did not affect the outcome of the election." Among its findings of fact, the court
determined that "there is no credible evidence that handling of the ballot boxes or the keys to the
ballot boxes by the County Clerk had any effect on the outcome of the election." The court also
concluded that "there is no credible evidence that there was a miscount or mistake in the count
because of the conduct of the election officials in the election" or that "any voters were
intimidated into not voting or voting for a person other than their choice." Thus, the outcome of
the election was not improbable or impossible to ascertain. Instead, the court determined in its
findings of fact that the true vote of the election was 927 to 926 for Featherston after discarding
ineligible votes. We overrule Des Champ's third point of error.



CONCLUSION


 We overrule appellant Des Champ's points of error and affirm the trial court's
judgment.


Before Justices Aboussie, Jones and Kidd

Affirmed

Filed: October 26, 1994

Publish

1.   The court stated in its findings of fact:


3. Five (5) persons voted in the election at issue who were ineligible to vote.


4. The ineligible votes are as follows: 


 a. Three (3) persons who voted in the election were ineligible because of
disqualifying felony convictions.


 b. One (1) person who voted in the election was ineligible to vote
because she had voted in the March 8, 1994, Republican primary
election.


 c. One (1) person who voted in the election was ineligible to vote
because he had been finally adjudged to be mentally incompetent.


5. The three persons disqualified from voting because of felony convictions
voted for Contestant Des Champs.


6. The person disqualified for voting because of having voted in the
Republican primary election voted for Contestee Featherston.


7. The person disqualified from voting because of a final judgment of
mental incompetency voted for Contestee Featherston.


8. The testimony of the disqualified voters as to how they voted was
credible.


9. The true vote count in the election is as follows: Contestee
Featherston--927, Contestant Des Chaps [sic]--926.
2.   In its undisputed findings of fact, the court determined that "[t]here is no credible
evidence that any voters were denied their right to vote by the moving of the polling place
in voting Precinct Number 3" and that the irregularities alleged by Des Champ did not
affect the outcome of the election.
3.   Steadman also testified that precinct three is in fact Featherston's home box and
that Featherston had done well during the primary election in that box. This suggests
that even if Steadman were a friend or supporter of Featherston, he would have little
incentive for making it more difficult for voters in precinct three to cast their ballots.
4.   The trial court misidentified some of its findings of fact as conclusions of law. 
However, the trial court's designation is not controlling on appeal. Although a finding
appears among conclusions of law, the appellate court may treat it as a finding of fact. 
Ray v. Farmers State Bank, 576 S.W.2d 607, 608 (Tex. 1979); Posner v. Dallas County Child
Welfare Unit, 784 S.W.2d 585, 587 (Tex. App.--Eastland 1990, writ denied). Conclusions of
law numbers 10 through 17 are actually findings of fact. 
5.   When reviewing the factual sufficiency of the evidence to support the finding of the
trier of fact, we must consider and weigh all the evidence and should set aside the
judgment only if it is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); In re King's
Estate, 244 S.W.2d 660, 661 (Tex. 1951); see also Pool v. Ford Motor Co., 715 S.W.2d 629
(Tex. 1986). See generally William Powers, Jr. & Jack Ratliff, Another Look at "No
Evidence" and "Insufficient Evidence," 69 Tex. L. Rev. 515 (1991).
6.   Even if we had determined that Pinckney's actions constituted a procedure whereby
the state enacts or administers a new voting procedure, we would still overrule Des
Champ's second point of error with regard to precinct eight. While it is unclear from the
record, it appears that the polling location for precinct eight was used for both the primary
and runoff elections without preclearance. However, Des Champ did not assert a Section 5
violation after the primary election on the grounds that the location was not precleared, and
thus should be estopped from making the objection after the runoff election. Additionally, the
undisputed findings of fact establish that "[t]here is no credible evidence that the change in
polling places in voting Precinct Number 8 had any effect in the outcome of the election."