

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-23-00099-CV

Daisy Campos **RODRIGUEZ**,
Appellant

v.

Ricardo "Richie" **RANGEL** Jr.,
Appellee

From the 49th Judicial District Court, Webb County, Texas
Trial Court No. 2022-CVK-001669-D1
Honorable Susan D. Reed, Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice
Concurring Opinion by: Rebeca C. Martinez, Chief Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Patricia O. Alvarez, Justice
                Sandee Marion, Chief Justice (Ret.)[1]

Delivered and Filed: November 13, 2023

AFFIRMED

In the Laredo City Council election contest between Daisy Campos Rodriguez and Ricardo

"Richie" Rangel Jr.,[2] the vote totals were very close, and Richie contested the election.  The trial

court found that (1) the accurate record of the votes cast was the election night count, (2) Richie

received six fewer votes, but (3) the number of illegal votes for Daisy was at least seven, and thus

---

[1] The Honorable Sandee Marion, Chief Justice (Retired) of the Fourth Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court.  *See* TEX. GOV'T CODE ANN. §§ 74.003, 75.002, 75.003.
[2] Some of the parties and voters share surnames.  To avoid confusion, we refer to the candidates and some voters by their first name or nickname.

(4) the true outcome of the election was that Richie won. Daisy appeals. In four issues, she challenges the trial court's decisions regarding the election's true outcome, including the most accurate vote count and some of its findings of illegal votes. We affirm the trial court's judgment.

## BACKGROUND

We begin with some background information.

### A. Laredo City Council Election

On November 8, 2022, Webb County conducted a general and special election, which included a contest for Laredo City Council District II. In that race, Daisy Campos Rodriguez and Ricardo "Richie" Rangel Jr. were opponents. The election night count for the District II race showed 4,155 ballots cast with 1,957 votes for Daisy and 1,951 votes for Richie.[3] The Cast Vote Record (CVR)[4] results, which matched the election night count exactly, gave Daisy a six-vote lead over Richie.

### B. Manual Recount

Richie requested a manual recount. *See* TEX. ELEC. CODE ANN. § 214.042(a) (choice of counting method). The recount was conducted by talliers hand-counting the ballots. The manual recount showed 4,151 ballots cast with 1,956 votes for Daisy and 1,945 votes for Richie.[5]

---

[3] The election night count included 4 overvotes and 243 undervotes.

[4] The Texas Secretary of State describes a Cast Vote Record as a "[p]ermanent record of all votes produced by a single voter whether in electronic or paper copy form." *See* Electronic Voting System Procedures, Glossary, https://www.sos.state.tx.us/elections/laws/electronic-voting-system-procedures.shtml (last visited Nov. 7, 2023). It may also be referred to as a "ballot image." *See id.*

[5] The "City of Laredo District 2 2022 Manual Recount Return Sheet," signed by the elections judge, showed 250 undervotes; it did not report any overvotes.

**C.     Machine Recount**

Richie filed an election contest, and he requested a court-ordered machine recount.  The trial court granted the request.  The machine recount showed 3,886 ballots cast with 1,841 votes for Daisy and 1,807 votes for Richie.[6]

**D.     Election Contest Trial**

At the bench trial of the election contest,[7] Richie called the Webb County Elections Administrator to testify about the election process, including the election night count, the CVR, and the two recounts.

To challenge some of the votes cast for Daisy, Richie argued that certain voters had falsely claimed residence in one of the precincts in District II, which made their vote illegal.  *See* TEX. ELEC. CODE ANN. § 11.003 (providing, generally, that "a person may vote only in the election precinct in which the person resides"); *id.* § 221.003 (defining an "'illegal vote' [as] a vote that is not legally countable").  Asserting they had voted illegally, Richie called sixteen witnesses.

He also called Daisy, who testified about her campaign and whether she had familial, social, or political relationships with some of the voter witnesses.

**E.     Final Judgment**

After two days of trial, on February 2, 2023, the trial court rendered its judgment and produced findings of fact and conclusions of law.  The judgment ordered that the election night results gave Daisy 1,957 votes and Richie just 1,951 votes, but at least seven illegal votes were cast for Daisy.  Accordingly, Daisy's vote count was 1,950 or less, and it declared Richie the winner of the November 8, 2022 election for Laredo City Council District II.

---

[6] The judicially ordered machine recount showed 4 overvotes and 234 undervotes.

[7] "Jury trials are not allowed in an election contest."  *Galvan v. Vera*, No. 04-18-00309-CV, 2018 WL 4096383, at *1 (Tex. App.—San Antonio Aug. 29, 2018, no pet.) (citing TEX. ELEC. CODE ANN. § 231.005).

**F.      Findings of Fact**

In its findings of fact and conclusions of law, the trial court found that the election night count and the CVR were "the accurate count of the votes."  It also found that fifteen of the sixteen voters that Richie challenged had voted for Daisy illegally.  The trial court "declare[d that] the illegal votes cast for [Daisy] must be deducted from her election night count and the accepted count by the Court, thus finding that [Richie] won the general election for Laredo City Council District II."

**G.      Daisy's Appeal**

Daisy timely filed a notice of appeal.

*1.      Daisy's Arguments*

In four issues, Daisy argues the trial court abused its discretion by doing the following: (1) admitting the election administrator's testimony about the most accurate vote record, (2) adopting the election night count instead of the manual recount, (3) attributing votes to Daisy for voters who testified they could not remember who they voted for, and (4) finding that certain voters had voted illegally.

She argues that the final canvass was the manual recount, which gave her an eleven-vote advantage; four of the fifteen votes the trial court found to be illegal were legal votes; and the result is a tie.

She also argues that even if all fifteen were illegal votes, only ten can properly be attributed to her, which would prevent the trial court from determining the true outcome of the election and require a new election.

Daisy asks this court to reverse the trial court's judgment, render judgment that the November 8, 2022 election for the District II seat is void, and remand the cause to the trial court with instructions to order the City of Laredo to order a new election.

*2.      Richie's Arguments*

Richie argues each of the trial court's findings is supported by sufficient evidence, including that the election night count was the true outcome of the election and that fifteen votes were illegally cast for Daisy. He notes that the election night count gave Daisy only a six-vote advantage, and she does not challenge six of the illegal vote findings.

According to Richie, beginning with the election night count and subtracting the six illegal votes for Daisy that she does not challenge on appeal, the parties start this appeal with a tie. Thus, if even one of the remaining nine illegal vote findings is upheld, the true outcome will show he won the election.

Richie asks this court to affirm the trial court's judgment and, because Daisy is currently serving as the representative for District II, he asks us to deny any motion for rehearing by Daisy.

## CHALLENGES TO EXPERT WITNESS OPINION

In her first issue, Daisy argues the trial court abused its discretion by admitting the election administrator's testimony about the most accurate vote count. We begin by relating additional relevant facts.

## A.      Additional Background

*1.      Election Administrator's Qualifications*

The first witness Richie called was José Luis Castillo, and he described his job. He had been the Webb County Elections Administrator for about a year and a half, and he was the elections administrator for the election being contested. When asked what training he received in that capacity, he responded that he had just successfully completed his second one-week annual training conference, and he received a certificate of completion.

### 2. *Election Night Count, Recounts*

Castillo testified that there were no problems with the election, and he was familiar with the election night count for the District II race, including the number of ballots counted, the number of votes for each candidate, and the number of overvotes and undervotes. He was also familiar with the associated manual recount and court-ordered machine recount.

### 3. *Expert Opinion, Daisy's Objections*

After Castillo described the results of the election night count, the manual recount, and the court-ordered machine recount, Castillo was asked the following: "Between those three results, Mr. Castillo, which do you think is the most accurate?" Daisy timely objected to Castillo's opinion testimony on two grounds: relevance and "giving an opinion."

The trial court overruled each objection.

## B. Daisy's Challenges to Witness's Testimony

On appeal, Daisy does not challenge the trial court's decision to overrule her relevance objection. Instead, to support her assertion that the trial court abused its discretion by admitting and relying on Castillo's opinion testimony, Daisy argues that (1) Castillo did not qualify as an expert witness, (2) his expert witness testimony was speculative and inadmissible, and (3) his lack of personal knowledge prevented his testimony as a lay witness.

We begin with Castillo's qualifications.

### 1. *Qualifying an Expert*

"For purposes of Rule 702, a witness is testifying as an expert witness when the witness's testimony, in substance, is based on special knowledge, skill, experience, training, or education in a particular subject." *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 850 (Tex. 2011) (citing TEX. R. EVID. 702); *accord Comm'n for Law. Discipline v. Cantu*, 587 S.W.3d 779, 785 (Tex. 2019). "[T]he party offering the expert's testimony bears the burden

to prove that the witness is qualified under [Rule] 702." *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718 (Tex. 1998) (alterations in original) (quoting *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996)).

Rule 702 states the requirements for an expert witness to give opinion testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

TEX. R. EVID. 702; *accord Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) (quoting *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001)). "Expert testimony is admissible if (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation." *Cooper Tire*, 204 S.W.3d at 800 (citing *Wilkins*, 47 S.W.3d at 499).

### 2. Appellate Review

"The trial court has broad discretion to determine admissibility, and we will reverse only if there is an abuse of that discretion." *Wilkins*, 47 S.W.3d at 499; *accord Cooper Tire*, 204 S.W.3d at 800. "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles." *Cooper Tire*, 204 S.W.3d at 800 (quoting *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995)).

### 3. Admissibility Within Trial Court's Discretion

It was the trial court's role was to consider the evidence of Castillo's qualifications and to determine the admissibility of his opinion testimony, and it had broad discretion in making that determination. *See Wilkins*, 47 S.W.3d at 499; *see also Cooper Tire*, 204 S.W.3d at 800.

The trial court heard Castillo testify about his experience as an elections administrator; the training he received in that capacity; and his personal knowledge of the election process, results,

and recounts. *See* TEX. R. EVID. 702 (listing experience, knowledge, and training as expert witness qualification factors); *Cooper Tire*, 204 S.W.3d at 800; *Wilkins*, 47 S.W.3d at 499.

Having reviewed the evidence, we conclude it was within the trial court's broad discretion to decide that Castillo was qualified and his opinion about the most accurate vote count was "relevant and based on a reliable foundation." *See Cooper Tire*, 204 S.W.3d at 800 (citing *Wilkins*, 47 S.W.3d at 499). Accordingly, we cannot conclude that "the trial court acted without reference to any guiding rules or principles." *See id.* (quoting *Robinson*, 923 S.W.2d at 558).

### 4. Expert Witness Objection Waived

Even if we assume that the trial court abused its discretion in admitting Castillo's opinion, which we do not, it would be mere harmless error because Daisy waived her complaint.

"The general rule is error in the admission of testimony is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) (citing *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984)); *accord Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007) (per curiam).

Of considerable consequence here, Daisy's objections to the admissibility of Castillo's opinion testimony were made and overruled very early in his testimony. Castillo's testimony, as shown in the reporter's record, comprises eighty-one pages.[8]

In the first four pages of Castillo's testimony, he describes his qualifications and his familiarity with the election night count and the two recounts. On the fifth page, Castillo was asked which vote count was the most accurate, Daisy timely objected, and the trial court overruled her objections.

---

[8] In the reporter's record for the first day of trial, Castillo's testimony starts on page 53. On page 57, Daisy's objections were made and overruled. Castillo's testimony continued through page 133.

But Castillo's testimony continued for another seventy-seven pages—without any objections by Daisy. *Cf. Bay Area Healthcare*, 239 S.W.3d at 236 (observing that "a timely requested running objection could have preserved the [objecting parties'] complaint for appeal, but they did not seek such an objection at that time"). In his unobjected to testimony, Castillo testified extensively about the details of the election night count, the CVR, the manual recount, the machine recount, and the hardware and software that comprises the Election Systems & Software (ES&S) voting system. He again opined, without objection, that the election night count—which matched the CVR—was the most accurate record of the votes cast.

Because Daisy failed to object to Castillo's additional testimony, including his opinion that the election night count was the most accurate record of the votes cast, she waived her admissibility complaint.[9] *See id.* at 235; *Ramirez*, 159 S.W.3d at 907; *Richardson,* 677 S.W.2d at 501.

## C.    Speculative, Conclusory Opinion

In the second argument of her first issue, Daisy contends that "Castillo's opinion that the election night vote count was the most accurate is highly subjective and speculative." She insists that "his testimony lacked a sufficient basis, relied on conclusory statements, and failed to provide the necessary clarity or evidence to support his assertions." Therefore, the trial court could not have properly considered Castillo's opinion "in determining the accuracy of the election night vote count."

At trial, Daisy did not object to Castillo's additional testimony as subjective or speculative. Now, she argues that she may raise these arguments for the first time on appeal.

---

[9] *But see* TEX. R. APP. P. 33.1(d) ("In a civil nonjury case, a complaint regarding the legal or factual insufficiency of the evidence . . . may be made for the first time on appeal in the complaining party's brief."); *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009) ("[A] party may complain that conclusory opinions are legally insufficient evidence to support a judgment even if the party did not object to the admission of the testimony."); *Arkoma Basin Expl. Co., Inc. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 388 (Tex. 2008) (noting that "no objection is required if [evaluating] the complaint 'is restricted to the face of the record'" (quoting *Coastal Transp. Co., Inc. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 233 (Tex. 2004))).

*1.      Conclusory Statement or Opinion*

An objection to the *reliability* of an expert's testimony is waived if not timely made at trial. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 817 (Tex. 2009) ("[W]hen a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis." (quoting *Coastal Transp. Co. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 233 (Tex. 2004))); *see Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 388 (Tex. 2008).

But "a party may complain that conclusory opinions are legally insufficient evidence to support a judgment even if the party did not object to the admission of the testimony." *Pollock*, 284 S.W.3d at 816 (citing *Coastal Transp. Co.*, 136 S.W.3d at 232).

> [A]n expert's statement or opinion is conclusory when: (1) he asks the jury to take his word that his opinion is correct but offers no basis for his opinion or the bases offered do not actually support the opinion; or (2) he offers only his word that the bases offered to support his opinion actually exist or support his opinion.

*Windrum v. Kareh*, 581 S.W.3d 761, 769 (Tex. 2019) (citing *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010)); *accord Bustamante v. Ponte*, 529 S.W.3d 447, 462 (Tex. 2017) ("An expert's testimony is conclusory if the witness simply states a conclusion without an explanation or factual substantiation.").

If the expert witness "provide[s] a basis for his opinion, and that basis does provide some support for his opinion," the testimony is not conclusory. *See Bustamante*, 529 S.W.3d at 463–65 (recognizing that the expert witness's testimony "could have been better," but because the expert's opinion was based on the evidence, his observations, and his experience, his opinion was not mere speculation); *Arkoma Basin Expl. Co.*, 249 S.W.3d at 389 (analyzing the legal sufficiency of the evidence supporting a damages award, including an expert witness's testimony, and deciding that

"we cannot say on this record that his opinions were unreliable or speculative [n]or were they conclusory as a matter of law [because he] did not simply state a conclusion without any explanation, or ask jurors to 'take my word for it'").

2.      *Accuracy of Election Night Count*

Castillo testified that the election night count was the most accurate, and he continued testifying, without objection, to the reasons for his opinion. He based his opinion, in part, on the exact match between the election night count and the Cast Vote Record (CVR). He was asked, "[W]hat is a cast vote record and why [do] you have faith in it?"

> The cast vote record is, basically, a digital fingerprint of the Election Night or Election Day ballots. When one goes in to vote . . . , then one is inserting the ballot into a digital scanner at every precinct location.
>
> Now, at the moment that the ballot is scanned—not only is it counted—but our system, which is the Election Software, through ES&S, it does a digital [photo]graph of the ballot; and ancillary to that, it also creates a cast vote record. Now, a cast vote record is, basically, a confirmation showing for each ballot how that ballot was counted.
>
> That cast vote record should match and does match how the ballot is counted; and it stores it.
>
> . . . .
>
> So, on Election Night, on November 8th, we had 46,002 votes cast County-wide. So, I have 46,002 digitally scanned ballots and cast vote records created for each ballot. It's, basically, an exact digital fingerprint of every ballot on Election Day.

Castillo noted that, in accordance with the trial court's order, he had extracted from the county-wide votes "all of the cast vote records from District II." He was asked if "the cast vote record [was] consistent with the Election Night Count, the 4,155 total ballots for this race?" He answered as follows:

> Correct. The server or the system, ES&S, the software, it also gives me a PDF; and I'm able to, I guess, ask the PDF to give me the vote totals—not from the official ballots, but from the digital fingerprint ballots—to give me a total from Election Night, and it matched the Election Day results.

*3.  Manual Recount Errors*

Castillo also testified about the errors in the manual recount.  He observed the manual recount.  *Cf.* TEX. ELEC. CODE ANN. § 213.001 ("The custodian of voted ballots in the election, or the custodian's designee, is entitled to be present at each phase of the recounting process.").  He explained the tallying process including counting the votes separately by precinct.  *See* TEX. ELEC. CODE ANN. § 213.011 ("The recount committee shall count the votes separately by precinct.").

When asked why the manual recount votes differed from the election night and CVR counts, he responded: "my honest opinion is human error."  He explained that for the manual recount of each precinct's ballots, they used this process:

> [W]e opened up the ballots—me and my staff—and we pulled them out manually, all [of the] ballots. So, for example, if we had 25 ballots, we didn't turn them over to the talliers until we had all the 25.  Now, if we were missing one, then we would go through the ballots, again, to make sure we found it.
>
> So, we turned all [of each precinct's] ballots to the talliers.  Now, the talliers, I guess, they got tired—their eyes or they counted wrong—that's something to think of because the complete number of ballots were handed over to the talliers; and I would just imagine that it was just human error, they were tired, and they marked it wrong for that count.

*4.  Opinion Testimony Not Conclusory*

Daisy argues that Castillo's opinion about the election night count was speculative and lacked evidentiary support, but the record rebuts her insufficiency argument.  *See Pollock*, 284 S.W.3d at 816 (allowing a legal sufficiency challenge to an allegedly conclusory opinion).

It shows that Castillo explained, with factual substantiation, how he evaluated the accuracies of the election night count and the manual recount, and the facts and his explanations support his opinion.  *See Bustamante*, 529 S.W.3d at 463; *Arkoma Basin Expl. Co.*, 249 S.W.3d at 389.  Therefore, Castillo's opinion that the election night count was the most accurate record of the votes cast was neither speculative nor conclusory, and the trial court was free to consider it.

**D.    Opinion Testimony as Lay Witness**

In the third argument of her first issue, Daisy contends that Castillo's lack of personal knowledge prevented his testimony as a lay witness under Rule 701.  She complains that some of Castillo's answers about whether the cast vote record and the election night count came from the same data showed "that his opinions were not based on his personal knowledge or direct perception."

But Rule 701's requirements apply when "a witness is *not* testifying as an expert."  *See* TEX. R. EVID. 701 (emphasis added); *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 851 (Tex. 2011).

We have already concluded that Castillo was qualified as an expert witness, and Castillo's testimony about the cast vote record and the election night count was based on his specialized knowledge, experience, and training as an elections administrator.  *See Reid Rd. Mun. Util. Dist. No. 2*, 337 S.W.3d at 851 ("[W]hen the main substance of the witness's testimony is based on application of the witness's specialized knowledge, skill, experience, training, or education to [a particular subject], then the testimony will generally be expert testimony within the scope of Rule 702."); *see also Comm'n for Lawyer Discipline v. Cantu*, 587 S.W.3d 779, 785 (Tex. 2019) (same).

Accordingly, Daisy's complaint that Castillo's opinion testimony did not meet Rule 701's requirements is not applicable.  *See* TEX. R. EVID. 701; *Reid Rd. Mun. Util. Dist. No. 2*, 337 S.W.3d at 851.

We overrule Daisy's first issue.

**ADOPTING ELECTION NIGHT COUNT**

In her second issue, Daisy argues the trial court abused its discretion in determining the final canvass by rejecting the results of the manual recount in favor of the election night count.[10] She contends that after the recount committee's report was canvassed, it became the official canvass, and the original canvass—the election night count—was void. *See* TEX. ELEC. CODE ANN. § 213.033(a) ("An original canvass for the office or measure is void, and the new canvass is the official canvass for the election on that office or measure.").

Before we address her arguments, we relate the applicable law and standards of review.

A.     **Election Contest Process**

"The purpose of an election contest is to determine whether the outcome of an election is correct." *Flores v. Cuellar*, 269 S.W.3d 657, 660 (Tex. App.—San Antonio 2008, no pet.) (citing TEX. ELEC. CODE ANN. § 221.003(a)); *accord Galvan v. Vera*, No. 04-18-00309-CV, 2018 WL 4096383, at *2 (Tex. App.—San Antonio Aug. 29, 2018, no pet.) (mem. op.).

"Section 221.003 provides that the court shall attempt to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome." *Slusher v. Streater*, 896 S.W.2d 239, 242 (Tex. App.—Houston [1st Dist.] 1995, no writ); *accord Galvan*, 2018 WL 4096383, at *2.

"To overturn an election, the contestant must prove by clear and convincing evidence that voting irregularities materially affected the election results." *Flores*, 269 S.W.3d at 660; *Galvan*, 2018 WL 4096383, at *2; *see Slusher*, 896 S.W.2d at 241. "A contestant can establish the outcome was materially affected by showing: (1) illegal votes were counted or an election official failed to

---

[10] In her opening statement, Daisy initially criticized the administrative recount, which was conducted by hand-counting the ballots. She described it as "so chaotic because it was a manual recount," and endorsed the court-ordered machine count as the accurate record of the votes cast. But at closing, she argued that the manual recount was the accurate record of the votes cast.

count legal votes or engaged in other fraud, illegal conduct, or mistake; and (2) a different result would have been reached." *Galvan*, 2018 WL 4096383, at *2 (citing Tex. Elec. Code Ann. § 221.003(a); *Flores*, 269 S.W.3d at 660).

**B.     Standards of Review**

We review a trial court's judgment in an election contest for an abuse of discretion. *Flores*, 269 S.W.3d at 660 (citing *Tiller v. Martinez*, 974 S.W.2d 769, 772 (Tex. App.—San Antonio 1998, pet. dism'd w.o.j.)).  In determining whether the trial court abused its discretion, we may consider the sufficiency of the evidence supporting its findings of fact. *Jones v. Morales*, 318 S.W.3d 419, 423 (Tex. App.—Amarillo 2010, pet. denied); *see Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991).

*1.     Legal Sufficiency*

For a legal sufficiency review of a finding where a clear and convincing evidence standard applies, "'[we] look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *accord Galvan*, 2018 WL 4096383, at *2.  We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re Z.N.*, 602 S.W.3d at 545 (quoting *In re J.F.C.*, 96 S.W.3d at 266); *accord Galvan*, 2018 WL 4096383, at *2.  If we "'determine[] that [a] reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true,'" the evidence is legally sufficient. *See In re Z.N.*, 602 S.W.3d at 545 (quoting *In re J.F.C.*, 96 S.W.3d at 266); *Galvan*, 2018 WL 4096383, at *2.

*2.     Factual Sufficiency*

For a factual sufficiency review of a finding where a clear and convincing evidence standard applies, we review the entire record and "[we] must give due consideration to evidence

that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266 (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *Galvan*, 2018 WL 4096383, at *3. We must also consider "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266; *accord In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). If the evidence would allow "a factfinder [to] reasonably form a firm belief or conviction about the truth of the [challenged finding]," and the evidence contrary to the finding is not so significant that "a factfinder could not reasonably have formed a firm belief or conviction," the evidence is factually sufficient. *See In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25; *Galvan*, 2018 WL 4096383, at *3.

### 3. Due Deference to Factfinder

Even when a clear and convincing evidence standard applies, "[a] court of appeals must nevertheless still provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *accord Galvan*, 2018 WL 4096383, at *3; *see also N. E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 255 n.50 (Tex. 2020) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005)) ("Under any standard of review, the fact-finder is the sole judge of the credibility of witnesses and the weight to give their testimony.").

We begin by reviewing the evidence[11] relating to which count or recount was the accurate record of the votes cast.

---

[11] We reviewed the entire record, and we have based our decisions on that comprehensive review. Although we recite some evidence in more than one part of this opinion, we have not repeated every relevant fact in each part. For example, in our analysis of the trial court's decision to adopt the election night vote count as the official result, we consider, but do not repeat in detail, Castillo's testimony about the accuracy of the election night count and the manual recount errors.

- 16 -

C.      **Election Administrator Role, Training**

At trial, Castillo testified he was the election administrator for the election being contested. He had served as an election administrator for about eighteen months, and in that period, he had been to two one-week training conferences. He supervised the general election, the manual recount, and the court-ordered machine recount.

D.      **Voting System Functions**

Castillo also described how the county's Election Systems & Software (ES&S) voting system works, including its system software, Express Vote "ballot marker" machine, the DS200 optical scanner, and the DS450 optical scanner.

He repeatedly stated that the voting system software produced two vote count reports: one derived from the ballot's bar code scan and another generated from the digitized ballot images. He explained how each ballot is counted and scanned: "[A]t the moment that the ballot is scanned—not only is it counted—but our system, which is the Election Software, through ES&S, it does a digital [photo]graph of the ballot; and ancillary to that, it also creates a cast vote record." He added that "the [voting system] software, it also gives me a PDF; and I'm able to, I guess, ask the PDF to give me the vote totals—not from the official ballots, but from the digital fingerprint ballots—to give me a total."

The trial court asked him to confirm that the CVR report was generated from the ballot images, and he confirmed it was.

On cross examination, he was asked if he had "training to know that it's reading the photograph." He acknowledged that he did not "have individual confirmation that I know how everything works [and I] couldn't tell you 100 [percent]." When Daisy's counsel asserted that "Technologically, you don't know how it's putting together those numbers," he responded "Correct."

**E.     Vote Count Results**

The election night count, the CVR report, the manual recount, and the machine recount results were each admitted into evidence, and this table shows the results.

| Votes | Election Night | Cast Vote Record | Manual Recount | Machine Recount |
|---|---|---|---|---|
| Ricardo "Richie" Rangel Jr. | 1,951 | 1,951 | 1,945 | 1,807 |
| Daisy Campos Rodriguez | 1,957 | 1,957 | 1,956 | 1,841 |
| Overvotes | 4 | 4 | | 4 |
| Undervotes | 243 | 243 | 250 | 234 |
| Totals | 4,155 | 4,155 | 4,151 | 3,886 |

Castillo testified about each of these vote counts. He confirmed that the election night count showed 4,155 ballots cast, and the CVR report matched the election night results exactly.

**F.     Election Night Count, Cast Vote Record**

Castillo testified that on election night, they had "[no] problems" with the voting process: the machines worked properly, and they had no problems with scanning ballots. For Laredo City Council District II, they had a total of 4,155 ballots. The District II votes in the Election Night Count and the Cast Vote Record (CVR) report matched exactly; there were no variations between the two reports.

**G.     Manual Recount**

The manual recount was conducted in late November 2022, and Castillo observed it. The recount committee return sheet did not report any overvotes, and none of the vote totals matched the election night count and CVR totals. The return sheet reported that the talliers counted a total of 4,151 ballots, which was four less than the actual number of ballots. *See* TEX. ELEC. CODE ANN. § 213.012 (recount committee report); *Reyes v. Zuniga*, 794 S.W.2d 842, 843 (Tex. App.—San Antonio 1990, no writ) (per curiam).

At trial, Castillo described the tallying process including hand-counting the ballots by precinct. *See* TEX. ELEC. CODE ANN. § 213.011 ("The recount committee shall count the votes separately by precinct."). When he was asked why the manual recount vote totals and number of ballots did not match the election night count or CVR, he attributed it to human error.

**H.      Machine Recount**

The machine recount took place in January 2023, and Castillo observed it.

At trial, he testified that there were more than ten ballots that were unreadable, and the total ballots counted were about 252 fewer than the election night count. He explained that the paper ballots were stored in an area that was not air conditioned on weekends, and the room "gets pretty hot." Because of the heat, the ballots start to stick together, and the heat tends to smear the thermal printing on the ballots. He explained that "[w]hat was messed up in storage were the bar codes, the bar codes which [the scanner] reads."

**I.      Trial Court's Decision, Findings**

In its remarks after the parties' closing arguments, the trial court opined that it thought "[Castillo's] testimony was very believable, and he knew what he was talking about."

A few days later, before announcing its decision, the trial court stated that "I went back over all of my notes and the evidence, thoroughly; and I've made certain findings of fact as well as a judgment in the case." The court continued: "I am accepting the vote of Election Night as the count to be used; and, that is confirmed and corroborated by that CVR Report . . . ."

**J.      Evidence of Accurate Count**

The trial court was the factfinder; its role was to consider the evidence and assess the weight and credibility of the witness testimony. *See Riou*, 598 S.W.3d at 255 n.50 (citing *City of Keller*, 168 S.W.3d at 819). While remembering the due deference we owe to the trial court's decisions,

we summarize the evidence the trial court could have considered and credited. *See In re A.B.*, 437 S.W.3d at 503; *Galvan*, 2018 WL 4096383, at *2–3.

*1.     Ballot Count Discrepancy*

It could have considered the ballot count difference and Castillo's explanations for the difference. As its oral statement and findings show that it did, it could have believed Castillo when he said the CVR report was generated using a different method than the vote count, and it could have given weight to the fact that the vote count and the CVR report results were identical. The trial court could have accepted Castillo's undisputed testimony that his team confirmed the exact number of ballots it gave to the talliers, but the talliers' counts did not match any of the election night or CVR counts. It could have believed Castillo's explanation that the most likely reason for the talliers' counts varying from the election night and CVR counts—which were identical—was "just human error, they were tired, and they marked it wrong for that count." The trial court could have also believed the undisputed fact that the talliers' count was only 4,151—four less than the election night and CVR counts.

*2.     Overvotes Discrepancy*

Daisy suggested that the four missing ballots were overvotes because the manual recount return sheet did not have a line entry for overvotes. But the trial court could have observed that the manual recount return sheet was not a standardized, preprinted form.

Instead, as Castillo testified, the recount was conducted in accordance with the Election Code. The code requires "the recount committee chair [to] prepare a report of the committee's vote count and sign the report." *See* TEX. ELEC. CODE ANN. § 213.012(a); *Reyes v. Zuniga*, 794 S.W.2d 842, 843 (Tex. App.—San Antonio 1990, no writ) (per curiam).

The trial court could have observed that the manual recount return sheet was prepared specifically for this recount, it could have included a line showing the number of overvotes, but it did not report any.

Further, Daisy presented no testimony or other evidence to show that the four missing ballots were overvote ballots.

### 3. Accuracy of Manual Recount Return Sheet

In determining whether the manual recount report was an accurate report of the tallier's hand counting, the trial court could have believed Castillo's undisputed testimony that the manual recount followed all the Election Code requirements, including counting the votes by precinct, *see* TEX. ELEC. CODE ANN. § 213.011 (requiring votes to be recounted separately by precinct), and reporting each vote it counted, *see* TEX. ELEC. CODE ANN. § 213.012(a); *Reyes*, 794 S.W.2d at 843.

Accordingly, it could have accepted the manual recount return sheet report as an accurate statement of the manual recount results, *see* TEX. ELEC. CODE ANN. § 213.012(a) (recount committee report); *Reyes*, 794 S.W.2d at 843, which showed the talliers reported counting only 4,151 ballots.

### K. Election Night Count was Accurate Record

The trial court's statutory duty was to "attempt to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because . . . an election officer or other person officially involved in the administration of the election . . . made a mistake." *See* TEX. ELEC. CODE ANN. § 221.003(a); *Slusher v. Streater*, 896 S.W.2d 239, 242 (Tex. App.—Houston [1st Dist.] 1995, no writ).

To resolve the discrepancies in the number of overvotes and the total number of ballots cast, the trial court could have (1) inferred from Castillo's undisputed testimony that his team verified the exact number of ballots for each precinct before it gave them to the talliers, (2) found

that Castillo's team gave the talliers exactly 4,155 ballots, (3) accepted Castillo's testimony that the ballot count difference was due to human error, and (4) found that the unexplained four ballot discrepancy was objective evidence that the manual recount "[was] not the true outcome because . . . an election officer or other person officially involved in the administration of the election . . . made a mistake." *See* TEX. ELEC. CODE ANN. § 221.003(a); *Slusher*, 896 S.W.2d at 242.

Having examined the evidence under the legal and factual sufficiency standards of review, we conclude the trial court could have found by clear and convincing evidence that the persons involved in the manual recount made mistakes, the manual recount was not the true outcome, and the election night count and CVR report results accurately reflected the votes cast. *See* TEX. ELEC. CODE ANN. § 221.003(a); *Slusher*, 896 S.W.2d at 242.

Accordingly, the error-stricken manual recount did not make the election night count void. *See* TEX. ELEC. CODE ANN. § 221.003(a) (tribunal's scope of inquiry); *id.* § 213.033 (canvass after recount); *Slusher*, 896 S.W.2d at 242.

Although the evidence was sufficient without it, the trial court could also have relied on, as it said it did, Castillo's testimony that the election night count, as verified by the CVR report, was the accurate record of the votes cast. Therefore, in adopting the results of the election night count rather than the manual recount, the trial court did not abuse its discretion.

We overrule Daisy's second issue.

### VOTERS WHO DID NOT REMEMBER THEIR VOTE

In her third issue, Daisy contends the trial court abused its discretion by attributing five illegal votes to her where the voters testified that they did not remember who they voted for. For

these five voters,[12] Daisy concedes that they voted illegally, but she challenges the trial court's findings that they voted for her, and she presents two different arguments.

## A. Evidence of How a Voter Voted

In her first argument of her third issue, Daisy argues "the only competent evidence for how an individual voted is their own testimony."

### 1. Election Code Changes

She points to a previous version of the Election Code that included this provision:

> In an election contest or criminal proceeding in which the issue is relevant, any voter who fraudulently or illegally casts a ballot or who casts a fraudulent or illegal ballot at any general, special, or primary election may be required and compelled, after the fraud or illegality has been established by competent evidence before a tribunal of competent jurisdiction, to disclose in testimony before the tribunal having jurisdiction of the matter the name of any candidate for whom he voted and the way he voted on any question at the election. The voter's testimony may be impeached by the testimony of other witnesses in regard to statements by the voter, either before or after the election, or by other competent evidence; and the issue of how the voter voted shall be decided on the basis of all the evidence before the tribunal.

*Miller v. Hill*, 698 S.W.2d 372, 374 (Tex. App.—Houston [14th Dist.] 1985) (per curiam), *cause dismissed*, 714 S.W.2d 313 (Tex. 1986) (quoting Act of May 12, 1977, 65th Leg., R.S., ch. 247, § 10, 1977 Tex. Gen. Laws 657, 661 (then codified at V.A.T.S. Election Code art. 9.38(b))).

She notes that the current version merely allows the trial court, in certain circumstances, to compel a voter to disclose how they voted:

> A voter who cast an illegal vote may be compelled, after the illegality has been established to the satisfaction of the tribunal hearing the contest, to disclose the name of the candidate for whom the voter voted or how the voter voted on a measure if the issue is relevant to the election contest.

TEX. ELEC. CODE ANN. § 221.009(a).

---

[12] Jaqueline Estevis, Karla Pereyra, Maria De Los Angeles Martinez, Staci Navarro, and José A. Carrizales.

She points to the second sentence of the previous version, which does not appear in the current version, and two cases addressing changes in statutes where previous statutory language was removed.

a.        Cited Cases

In *Gateley v. Humphrey*, the court stated that "[o]rdinarily, the mere fact that significant words are omitted from the re-enactment or amendment of a statute imports a conclusive presumption that the Legislature intended to exclude the object theretofore accomplished by the abandoned words." 254 S.W.2d 98, 101 (Tex. 1952) (quoting *San Marcos Baptist Acad. v. Burgess*, 292 S.W. 626, 627 (Tex. App.—San Antonio 1926, no writ)).

In *Loving v. City of Houston*, the court stated that "[w]hen the legislature amends a statute and excludes certain language of the former statute in its new version, we are to presume the language was excluded for a reason and the excluded language is no longer the law." 282 S.W.3d 555, 560 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (noting that because the predecessor statute "expressly provided an exception to confidentiality for such a situation" and the current version does not, "the requested information [was] excepted from disclosure").

Given the Election Code's changed provision and these two cases, Daisy concludes the legislature intended section 212.009(a) to prevent a trial court from considering any evidence other than the voter's testimony to determine how the voter voted. *See* TEX. ELEC. CODE ANN. § 212.009(a); *Gateley*, 254 S.W.2d at 101; *Loving*, 282 S.W.3d at 560.

b.        Cited Cases Inapplicable

While Daisy's cited cases apply to their specific circumstances, the quoted propositions are not universally applicable, and we conclude they do not apply here.

The current version of section 212.009(a) does not mention how a voter may be impeached or what evidence a trial court may consider in determining how the voter voted, TEX. ELEC. CODE

ANN. § 221.009(a), but the removal of such language must be considered in the broader context of existing statutes, rules, and case law.

"A statute is presumed to have been enacted by the Legislature with complete knowledge of the existing law and with reference to it." *Barbara Techs. Corp. v. State Farm Lloyds*, 589 S.W.3d 806, 814 (Tex. 2019) (quoting *Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990)).

When the Election Code provision was amended in 1985, the existing law already allowed a witness to be impeached by various means. *E.g.*, TEX. R. EVID. 607, 608, 609, 613; *Skillern & Sons, Inc. v. Rosen*, 359 S.W.2d 298, 301 (Tex. 1962) (discussing impeaching a witness with a prior inconsistent statement). It also allowed a trial court to evaluate a witness's testimony: "[It is] the province of the [factfinder] to judge the credibility of the witnesses and the weight to be given their testimony. It was [its] province also to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses." *Ford v. Panhandle & Santa Fe Ry. Co.*, 252 S.W.2d 561, 563 (Tex. 1952); *accord Benoit v. Wilson*, 239 S.W.2d 792, 796–97 (Tex. 1951); *see generally McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (citing pre-1985 cases).

We presume the legislature was aware of these long-established aspects of the law, *see Acker*, 790 S.W.2d at 301, and we conclude the plain language of its amended provision does not preclude their application, *see* TEX. ELEC. CODE ANN. § 221.009(a).

  c. <u>Instructive Case</u>

In contrast to Daisy's cited cases, a recent supreme court case is instructive. In *Barbara Technologies*, the court considered the absence of appraisal language in the Texas Prompt Payment of Claims Act (TPPCA):

> The TPPCA, codified in Texas Insurance Code chapter 542, imposes procedural requirements and deadlines on insurance companies to promote the prompt payment of insurance claims.
>
> . . . .
>
> Nowhere does the TPPCA mention appraisals or how invocation of an appraisal process affects the TPPCA's deadlines and requirements. There is no question, however, that appraisal clauses were in use and enforceable well before enactment of the TPPCA. And there is no question that the Legislature knows how to fit appraisals into a statutory scheme governing the evaluation and payment of insurance claims . . . . We must interpret the absence of any such language in chapter 542 to mean that the Legislature intends neither to impose specific deadlines for the contractual appraisal process within the TPPCA scheme nor to exempt the contractual appraisal process from the deadlines provided by the TPPCA.

*Barbara Techs.*, 589 S.W.3d at 812, 814 (citations omitted).

We recognize that *Barbara Technologies* did not address the removal of language from a previous statute, but its analysis of the absence of statutory language is still helpful. *See id.* at 814. Like *Barbara Technologies*, we consider the amended Election Code provision with the understanding that "[witness impeachment and testimony evaluation practices] were in use and enforceable well before enactment of the [amended Election Code provision]." *Cf. id.*

We also recognize that, before the Election Code provision was changed, the legislature knew how to make changes to statutes governing examining witnesses and evaluating their testimony. *E.g.*, Code of Criminal Procedure Act, 59th Leg., R.S. ch. 722, § 1, 1966 Tex. Gen. Laws 317, 370 (codified at TEX. CODE CRIM. PROC. ANN. arts. 16.06–.08); *cf. Barbara Techs.*, 589 S.W.3d at 814 (considering the absence of appraisal language from a TPPCA provision given that "appraisal clauses were in use and enforceable well before enactment of the [provision]").

Although the legislature removed language from the Election Code that allowed a "voter's testimony [to] be impeached by the testimony of other witnesses in regard to statements by the voter, either before or after the election, or by other competent evidence," Act of May 13, 1985, 69th Leg., R.S., ch. 211, §§ 1, 9, 1985 Tex. Gen. Laws 802, 1076, we presume it did so "with

complete knowledge of the existing law [which included the then-applicable rules of evidence and case law which governed examination of witnesses and evidence a trial court could consider] and with reference to it," *see Barbara Techs.*, 589 S.W.3d at 814 (quoting *Acker*, 790 S.W.2d at 301).

Accordingly, we conclude that the legislature's intent in removing the previous language was not to prohibit a voter-witness from being impeached or to prevent a trial court from considering other evidence of how the voter voted. *Cf. id.*

We overrule Daisy's changed statutory language challenge to the five findings.

### d. Statutory Challenge Inapplicable

Daisy's changed statutory language argument was her only challenge to the trial court's findings that Jaqueline Estevis and Staci Navarro voted for her illegally. Because that challenge is inapplicable, and it was the only basis she raised for the two findings, we conclude that the trial court did not abuse its discretion in finding that Jaqueline Estevis and Staci Navarro voted for Daisy illegally.

We turn now to the remaining three voters.

## L. Sufficiency of the Evidence for Three Voters

In her second argument in her third issue, Daisy contends that "there was insufficient circumstantial evidence to show by clear and convincing evidence that Maria De Los Angeles Martinez, Karla Pereyra, or José A. Carrizales voted for [her]." She notes that each of these three voters testified that they could not remember who they voted for, and she challenges the sufficiency of the evidence to find that they voted for her.

Before we review the evidence for the challenged finding, we relate the applicable law.

### 1. Evaluating Witness Testimony

In this bench trial, the trial court was "the sole judge[] of the credibility of the witnesses and the weight to give their testimony." *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex.

2005); *accord Woods v. Legg*, 363 S.W.3d 710, 713–14 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Its role was to "resolve conflicts in the evidence." *City of Keller*, 168 S.W.3d at 819, 820; *accord McGalliard*, 722 S.W.2d at 697. It could "choose to believe one witness and disbelieve another." *City of Keller*, 168 S.W.3d at 819; *accord Woods*, 363 S.W.3d at 714. It could also "disregard even uncontradicted and unimpeached testimony from disinterested witnesses." *City of Keller*, 168 S.W.3d at 820; *Bryan v. Watumull*, 230 S.W.3d 503, 512 (Tex. App.—Dallas 2007, pet. denied).

We turn now to the evidence pertaining to the trial court's findings.

### 2. *Maria De Los Angeles Martinez*

In challenging the trial court's finding that Maria illegally voted for Daisy, Daisy notes that the trial court did not find that there was a connection between her and Maria, and she contends there was no evidence that Maria knew Daisy or Daisy's family.

### a. Maria's Testimony

Maria testified to the following facts.

> I was at a get-together with a close friend, a carne asada. We were there. We were having a carne asada, and there was this group of people going around the neighborhood asking to vote; and, I registered to vote.
>
> I did that, and then I went to go vote. It was just a carne asada get together—and we were all there—and I just went to go vote.
>
> . . . .
>
> So, there were a bunch of people walking around and everything; and they approached us—the bunch of people that were there—and like we just went to go vote. I signed a paper. Yes, I did; but, I did not remember what it was that it said; and then I went to go vote . . . .

When asked who she voted for, Maria testified "I don't recall who I voted for that day." Regarding the people who were walking around the neighborhood—the ones who came to the carne asada and registered her to vote—Maria was asked if she could identify them by what they

were wearing. She said they were wearing navy blue campaign t-shirts, but she did not "remember exactly what they were wearing."

When she was asked why she was registered to vote at an address where she had never lived, she explained that she gave the campaign workers her driver's license, "they put the information" on the voter registration form, and "[t]hey didn't tell me where they were going to register me, like to vote."

###### b. Documentary Evidence

Notably, Richie's exhibits included photographs showing some of Daisy's campaign supporters wearing navy blue t-shirts with the letters "Team Daisy Campos Rodriguez" on the front.

###### c. Trial Court's Finding

The trial court found that "[Maria] testified that she never lived in District II 'in her life,' although she registered her address as 3507 S. Martin, which is located in District II."

###### d. Sufficient Evidence

The trial court observed Maria first-hand, and it could have disregarded her testimony that she did not recall who she voted for. *See City of Keller*, 168 S.W.3d at 820 (disregarding uncontroverted testimony); *Bryan*, 230 S.W.3d at 512.

The trial court could have believed Maria's testimony that the people who registered her to vote were wearing navy blue campaign shirts, Daisy's campaign t-shirts were dark blue, and the workers registered Maria at a District II address where she had never lived. *See City of Keller*, 168 S.W.3d at 820; *Woods*, 363 S.W.3d at 714.

From the evidence, the trial court could have (1) reasonably found that the people who registered Maria were Daisy's campaign workers and (2) logically inferred that they encouraged Maria to vote for Daisy. *See In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020) (allowing the factfinder

to draw reasonable and logical inferences). And as Maria testified, just after she was registered to vote by the workers, she left the party and voted.

Having reviewed all the evidence under a clear and convincing standard, and giving due deference to the factfinder's decisions, we conclude the evidence was legally and factually sufficient for the trial court to have found that Maria voted for Daisy. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *Galvan v. Vera*, No. 04-18-00309-CV, 2018 WL 4096383, at *3 (Tex. App.—San Antonio Aug. 29, 2018, no pet.) (mem. op.).

### 3. *Karla Pereyra*

In challenging the trial court's finding that Karla illegally voted for her, Daisy points to (1) Karla's testimony that she did not know Daisy or her family and (2) no finding of a connection between Daisy and Karla.

#### a. Karla's Testimony

Karla testified to the following facts. She lived outside District II for all of 2022, but she voted in District II in the November 8, 2022 election. She did not know Daisy Campos or any of her family members. When asked who she voted for, Karla said "I don't remember. I just remember that that day I voted mostly for the democrats and the women."

#### b. Trial Court's Finding

In its finding, the trial court explained that "although [Karla] stated that she didn't know who she voted for, the Court finds she voted for [Daisy]." The finding does not expressly explain why the court found as it did, but we "must nevertheless provide due deference to the decisions of the factfinder." *See In re A.B.*, 437 S.W.3d at 503 (requiring due deference to the factfinder because "the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

c.       Sufficient Evidence

In observing Karla first-hand, the trial court could have disbelieved her testimony that she did not (1) know Daisy or any of her family members or (2) remember who she voted for. *See id.*; *Galvan*, 2018 WL 4096383, at *3. The trial court could have also reasonably and logically inferred that, because Karla testified that she "voted mostly for the democrats and the women," and Daisy is a woman, Karla voted for Daisy. *See In re Z.N.*, 602 S.W.3d at 545 (allowing the factfinder to draw reasonable and logical inferences).

Having reviewed all the evidence under a clear and convincing standard, and giving due deference to the factfinder's decisions, we conclude the evidence was legally and factually sufficient for the trial court to have found that Karla voted for Daisy. *See In re A.B.*, 437 S.W.3d at 503; *Galvan*, 2018 WL 4096383, at *3.

4.       *José A. Carrizales*

In her challenge to the trial court's finding that José voted for her, Daisy acknowledges that José's wife Staci was her former schoolmate, Staci supported Daisy's campaign, and José may have accompanied Staci to Daisy's campaign events. But she insists there was no evidence of any connection between José and her, and the fact that Staci participated in Daisy's campaign is no evidence that José voted for Daisy.

a.       Witness Testimony

We begin by reviewing José's and Staci's testimony.

José testified that he is married to Staci Navarro. In Staci's testimony, she admitted she went to "one or two" campaign events for Daisy.

Then Richie showed Staci some photographs and asked her about them.

Q. I'm going to show you a few pictures—
A. Uh-huh.

- 31 -

Q. —Ms. Navarro. Are you in one of these pictures with Ms. Campos Rodriguez wearing a Daisy Campos Rodriguez T-shirt?

A. Uh-huh. Yes, sir.

Q. Are you in this next photo now? I'm marking these right now.

A. (Reviewing) Yes.

Q. This is a poll site, and you are in a Daisy Campos Rodriguez T-shirt?

A. Yes.

Q. Are you on this one holding a Daisy Campos Rodriguez sign—

A. Yes.

Q. —on the sidewalk—

A. Yes.

. . . .

Q. How often did you wear that Daisy Campos Rodriguez T-shirt?

A. Like once or twice.

Richie asked José about any links he had to Daisy.

Q. Was your wife a Daisy Campos Rodriguez supporter?

A. They went to school together.

Q. Okay.

A. They were friends.

Q. So, you know Daisy Campos Rodriguez as a friend, as someone your wife went to school with?

A. We can say that.

Q. Did you ever see her wear a Daisy Campos Rodriguez T-shirt?

A. I'm not sure.

Q. Do you know or do you remember her going to a couple of campaign events with her friend Daisy Campos Rodriguez Rodriguez's T-shirt on and supporting that campaign?

A. I don't remember.

Q. Did you go to any campaign events for Daisy Campos Rodriguez with your wife?

A. Probably so. Probably. I was around.

**b.**      Trial Court's Finding

The trial court found that José's residence was not in District II. It also found the following:

> [José] is married to Staci Navarro, who was a schoolmate of [Daisy]. . . . He stated that he believes he went to campaign events. . . . His claim that he doesn't remember who he voted for is not credible. The Court finds his illegal vote was cast for [Daisy].

**c.**      Sufficient Evidence

In observing José and Staci first-hand, the trial court was the sole arbiter of the witnesses' credibility. *See In re A.B.*, 437 S.W.3d at 503; *see also N. E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 255 n.50 (Tex. 2020) ("Under any standard of review, the fact-finder is the sole judge of the credibility of witnesses and the weight to give their testimony.").

The trial court could have believed that Staci was actively involved in Daisy's campaign and that José was as well. *See In re A.B.*, 437 S.W.3d at 503; *Galvan*, 2018 WL 4096383, at *3. For example, it was undisputed that Staci, José's wife, was Daisy's school classmate. Staci wore Daisy's campaign T-shirt and attended campaign events for Daisy, and José admitted he attended some of Daisy's campaign events with Staci.

As José answered with "I'm not sure" and "I don't remember" responses, the trial court could assess his credibility; it was free to disbelieve his testimony that he did not remember whom he voted for, and given the other evidence, find that José voted for Daisy. *See In re A.B.*, 437 S.W.3d at 503; *Galvan*, 2018 WL 4096383, at *3.

Having reviewed all the evidence under a clear and convincing standard, and giving due deference to the factfinder's decisions, we conclude the evidence was legally and factually sufficient for the trial court to have found José voted for Daisy. *See In re A.B.*, 437 S.W.3d at 503; *Galvan*, 2018 WL 4096383, at *3.

**M.     Statutory, Sufficiency Arguments Fail**

Daisy's changed statutory language and sufficiency of the evidence arguments against the five findings fail.  Her contention that "the only competent evidence for how an individual voted is their own testimony" does not comport with the applicable law, and that was the only challenge she raised to the findings for Jaqueline and Staci.  And there was sufficient evidence for the trial court to find that Maria, Karla, and José voted for Daisy.

Accordingly, the trial court did not abuse its discretion in finding that Jaqueline Estevis, Staci Navarro, Maria De Los Angeles Martinez, Karla Pereyra, and José A. Carrizales illegally voted for Daisy.

We overrule Daisy's third issue.

**ILLEGAL VOTES BASED ON RESIDENCY**

In her last issue, Daisy argues there was insufficient evidence to support four of the trial court's findings that a person voted for her illegally because the voter did not meet the residency requirements.  She contends these four votes were valid and should be added to her vote total.

Before we address her voter-specific arguments, we briefly recite the applicable law.

**A.     Residency Requirements**

For the Election Code, "'residence' means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence."  TEX. ELEC. CODE ANN. § 1.015(a); *accord State v. Wilson*, 490 S.W.3d 610, 618 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *Woods v. Legg*, 363 S.W.3d 710, 714 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

Determining residence depends on multiple factors such as the person's volition, intention, and action.  *Mills v. Bartlett*, 377 S.W.2d 636, 637 (Tex. 1964); *McDuffee v. Miller*, 327 S.W.3d 808, 820 (Tex. App.—Beaumont 2010, no pet.).  But if a person makes statements about their residence "that are inconsistent with the facts showing actual residence, such statements 'are of

slight weight' and cannot establish residence in fact." *In re Graham*, 251 S.W.3d 844, 850 (Tex. App.—Austin 2008, orig. proceeding) (quoting *Texas v. Florida*, 306 U.S. 398, 425 (1939)); *accord Wilson*, 490 S.W.3d at 618; *Woods*, 363 S.W.3d at 715; *McDuffee*, 327 S.W.3d at 820.

Further, the code prohibits a person from "establish[ing] residence for the purpose of influencing the outcome of a certain election." TEX. ELEC. CODE ANN. § 1.015(b).

Generally, a qualified voter's residence determines where the person may vote: "Except as otherwise provided by this code, a person may vote only in the election precinct in which the person resides." *Id.* § 11.003; *In re Perez*, 508 S.W.3d 500, 506 (Tex. App.—El Paso 2016, orig. proceeding). An exception applies to certain voters who changed their residence:

> A registered voter who changes residence to another election precinct in the same county, if otherwise eligible, may vote a full ballot in the election precinct of former residence until the voter's registration becomes effective in the new precinct if the voter satisfies the residence requirements prescribed by Section 63.0011 and submits a statement of residence in accordance with that section.

TEX. ELEC. CODE ANN. § 11.004; *In re Perez*, 508 S.W.3d at 506.

"[Section 11.004] does not place a specific restriction on the length of time in which a voter who has moved to another election precinct in the same county may cast a ballot in his former precinct." *In re Jackson*, 14 S.W.3d 843, 847 (Tex. App.—Waco 2000, orig. proceeding) (citing TEX. ELEC. CODE ANN. § 11.004).

But section 63.0011 creates conditions to vote for voters who have changed their residence:

> If the voter's residence address is not current because the voter has changed residence within the county, the voter may vote, if otherwise eligible, in the election precinct in which the voter is registered if the voter resides in the county in which the voter is registered and, if applicable . . . resides in the political subdivision served by the authority ordering the election if the political subdivision is other than the county . . . .

TEX. ELEC. CODE ANN. § 63.0011(b); *accord In re Dominguez*, 621 S.W.3d 899, 903 n.5 (Tex. App.—El Paso 2021, orig. proceeding).

**B.      Evidentiary Standard**

To prove a voter did not meet the residency requirements, the election contestant must produce clear and convincing evidence. *See Flores v. Cuellar*, 269 S.W.3d 657, 660 (Tex. App.—San Antonio 2008, no pet.); *Galvan*, 2018 WL 4096383, at *2; *Woods*, 363 S.W.3d at 713.

**C.      Finding Facts**

In an election contest, the trial court is the factfinder. TEX. ELEC. CODE ANN. § 231.005; *Galvan*, 2018 WL 4096383, at *1 n.1. It assesses the weight and credibility of witness testimony, it may believe or disbelieve any witness, and it resolves conflicts in the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819–20 (Tex. 2005); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

Even when a clear and convincing evidence standard applies, "[a] court of appeals must nevertheless still provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *accord Galvan*, 2018 WL 4096383, at *3; *see Woods*, 363 S.W.3d at 713–14 ("In a bench trial, the trial court determines the credibility of the witnesses and the weight to be given their testimony.").

But the factfinder is "not free to believe testimony that is conclusively negated by undisputed facts," or "ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *City of Keller*, 168 S.W.3d at 820; *accord Woods*, 363 S.W.3d at 714.

We turn now to the trial court's four findings that Daisy challenged based on their residency.

**D.      Vicente Rodriguez Jr.**

The first finding Daisy challenges for residency is for Vicente Rodriguez Jr.  Vicente, a police officer for the City of Laredo, is Daisy's brother-in-law.

The trial court found that Vicente's residence was 7306 Ezra Pound Drive, which is not in District II, and he voted for Daisy illegally.  It subtracted Vicente's vote from Daisy's total.

Daisy protests.  She argues that Vicente's vote was valid because he complied with the statutory requirements for a voter who has changed residence.  We agree.

*1.      Vicente's Testimony*

Vicente testified to the following facts.  His brother is Vidal Rodriguez, the former city council representative for District II, who is married to Daisy.  On October 24, 2022, early voting was in progress, and Vicente went to a polling place in South Laredo to vote.  The voter registration records showed his address on Potomac Loop.

He explained to the election worker that he used to live at 3124 Potomac Loop, which is in District II, but he moved away from that address six or seven years earlier to 6115 Servando Drive, which is also in District II.  Then, in 2020, he moved to 7306 Ezra Pound Drive, which is in the City of Laredo, Webb County, but which is not in District II.

Vicente presented his driver's license, which showed his Ezra Pound address, and he asked the election worker for a ballot for that address.  The election worker told him, based on his voter registration address on Potomac Loop, he would have to vote in District II for this election, but for the next election, he could vote based on his Ezra Pound address.

Based on his Potomac Loop address, he voted for Daisy in the District II race.

He executed a Statement of Residence for his Ezra Pound address before he left the polling place that day, and a copy of his statement was admitted into evidence.

### 2. Trial Court's Finding

The trial court's finding for Vicente reads in its entirety as follows:

> Vicente Rodriguez [Jr.], [Daisy's] brother-in-law, had abandoned his registered residence at 3124 Potomac Loop, located in District II, six years before this election. Eight individuals are also registered to vote at this address. His residence is 7306 Ezra Pound. He is related to [Daisy], and he voted for [Daisy] illegally.

### 3. Residence History

Vicente's testimony about his residence history was undisputed, it included specific addresses and key dates, and Richie did not present any evidence to controvert it. *Cf. City of Keller*, 168 S.W.3d at 820 (undisputed, direct, consistent testimony).

The trial court found at least parts of Vicente's testimony credible because its finding adopted his testimony about when he moved from his Potomac Loop address, his current residence, and whom he voted for. *Cf. id.* (credible testimony).

### 4. Voting Procedures

Vicente also testified about what happened when he went to vote, and his account is consistent with the Election Code requirements for election workers.

At the polling place, he handed the election worker his license and told them his Potomac address was not correct. *See* TEX. ELEC. CODE ANN. §§ 63.001, .0011 (voting procedures). The worker informed him that, for this election, he would have to vote based on his Potomac Loop address, but for the next election, he could vote based on his Ezra Pound address. *See* TEX. ELEC. CODE ANN. § 11.004 (voting in former precinct); *In re Perez*, 508 S.W.3d at 506. Vicente completed and submitted his Statement of Residence, which was admitted into evidence, and the completed document shows it complies with the statutory requirements. *See* TEX. ELEC. CODE ANN. § 63.0011(c).

5.      *Insufficient Evidence of Illegal Vote*

Richie argued that Vicente voted illegally because he did not reside in District II at the time of the election, and Vicente confirmed that he did not.

But Vicente's undisputed testimony that he followed the procedures to vote in a previous precinct was undisputed, direct, consistent with election code procedures, and corroborated by documentary evidence; further, the trial court found at least parts of his testimony credible. *Cf. City of Keller*, 168 S.W.3d at 820 (stating that a factfinder "cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted").

We conclude that the evidence was neither legally nor factually sufficient for the trial court to have found by clear and convincing evidence that Vicente voted for Daisy illegally.

**E.      Juan Villa**

The second finding Daisy challenges for residency is for Juan Villa. Juan, a police officer for the City of Laredo, is Daisy's former brother-in-law. The trial court found that Juan had not lived at Pecos Plaza, his registered voter address in District II, since September 2021, and he voted for Daisy illegally. It subtracted Juan's vote from Daisy's total, and Daisy challenges the finding and the subtraction.

Before we consider Daisy's arguments, we recite some of the evidence.

1.      *Juan's Testimony*

Juan testified to the following facts. He is Daisy's former brother-in-law. For a while, he lived with his then-wife Valerie Campos, Daisy's sister; Daisy and her husband Vidal; and Valerie's parents at 3001 Pecos Plaza. Before his divorce from Valerie was finalized in January 2022, Juan moved to 511 Norwich Loop, which is not in District II. A month or two before the

election, he moved from 511 Norwich Loop to another residence, which was also outside District II.

At trial, he was asked what happened when he voted.

Q. So when you voted in the November 8th, 2022 election, do you remember if when you showed up you had to present some ID.

A. Correct.

Q. Do you remember if you showed your ID to the—to the election workers?

A. Yes.

Q. And did they ask you—do you remember if they said, "we've got you listed, Officer Villa, at 3001 Pecos Plaza?"

A. All they said was "31 Pecos Plaza."

Q. And you said, "yes?"

A. Yes.

Q. And they didn't say, "your address on your driver's license is different." "You should fill out a change of address form."

A. Not that I remember, no.

Q. You don't remember?

A. (Shakes head in the negative) They just said, "31 Pecos Plaza." I said, "yes."

Juan testified that he voted for Daisy.

*2.      Documentary Evidence*

The trial court admitted several documents pertaining to Juan's residence. His voter registration application dated January 1, 2016, showed his address as 3001 Pecos Plaza, Laredo, Webb County, Texas. In contrast, his Laredo Police Department Secondary Employment Request, dated January 10, 2022; his Texas Driver License, issued on July 22, 2022; and his bank and car insurance records for 2022 show his address as 511 Norwich Loop, Laredo, Texas.

*3.      Trial Court's Finding*

The trial court's finding for Juan reads in its entirety as follows:

He is [Daisy's] former brother-in-law. He voted for [Daisy]. He has not lived at Pecos Plaza, which is his registered voter address since September 2021. His

divorce from Valerie Campos was finalized on January 27, 2022. He voted illegally and admitted voting for [Daisy].

*4.    Daisy's Arguments*

Daisy argues that Juan's vote was valid because, although he moved from 3001 Pecos Plaza before the election, he moved to another residence in the City of Laredo, and he complied with the statutory requirements for a voter who has changed residence. *See* TEX. ELEC. CODE ANN. § 63.0011(b), (c); *In re Dominguez*, 621 S.W.3d 899, 903 n.5 (Tex. App.—El Paso 2021, orig. proceeding).

Section 63.0011 requires the election officer to ask each voter, before that person may vote, "if the voter's residence address on the precinct list of registered voters is current and whether the voter has changed residence within the county." TEX. ELEC. CODE ANN. § 63.0011(a); *Beaumont Chapter of NAACP v. Jefferson Cty.*, *Tex.*, No. 1:22-CV-00488, 2023 WL 5002453, at *2 n.4 (E.D. Tex. Aug. 4, 2023).

If an eligible voter's residence address has changed, but the voter still resides in the county, and the voter meets other requirements, the voter may vote in the election precinct corresponding to the current voter registration address with this proviso: "Before being accepted for voting, the voter must execute and submit to an election officer a statement [of residence]." TEX. ELEC. CODE ANN. § 63.0011(c); *accord In re Dominguez*, 621 S.W.3d at 903 n.5.

Daisy acknowledges that Juan did not complete a statement of residence as required, but she contends that a voter's duty to complete a statement is conditioned on the election official's duty to ask for one. *See Ramsay v. Wilhelm*, 52 S.W.2d 757, 760 (Tex. App.—Austin 1932, writ ref'd) (deciding that "the failure of these [election] officials to perform their duties [to ask voters to present their poll tax receipts before voting] should not be permitted to disfranchise a legal voter"). She claims the election official failed to notice that the address on Juan's driver's license

did not match his voter registration address, and the official failed to ask Juan to complete a statement of residence. She argues the election official's failure does not make Juan's vote illegal, and the evidence is insufficient to support the trial court's finding. *See id.*; *Barrera v. Garcia*, No. 04-12-00469-CV, 2012 WL 4096021, at \*2 (Tex. App.—San Antonio Sept. 19, 2012, no pet.) (mem. op.).

We disagree.

### 5. *Sufficient Evidence*

Daisy relies on *Ramsay* and *Barrera* to excuse Juan's failure to comply with section 63.0011,[13] but each case recognizes a fraud exception, and the trial court could have found that Juan's vote was fraudulent. *See Ramsay*, 52 S.W.2d at 759 (construing as directory those "provisions of the election laws which are not upon their face clearly mandatory" where there is "the absence [of] any showing of fraud"); *Barrera*, 2012 WL 4096021, at \*2 (same principle).

Juan testified that when he went to vote, he presented his driver's license to the election official, and the official asked him if his address was "31 Pecos Plaza." He twice testified that he answered "yes" to the election official's question. *Cf. Carson v. Johnston*, 57 S.W.3d 657, 659 (Tex. App.—Eastland 2001, no pet.) ("When a voter signs the voter roster prior to voting, the voter is certifying that he or she meets the residency requirements for the election.").

Having reviewed all the evidence under a clear and convincing standard, including the undisputed evidence that Juan did not live in District II at the time of the election and his false assurances to the election official that he still resided at Pecos Plaza, we conclude the evidence

---

[13] We do not reach the question of whether section 63.0011's statement of residence is clearly mandatory. *See* TEX. ELEC. CODE ANN. § 63.0011(c) (statement of residence requirement); *Ramsay v. Wilhelm*, 52 S.W.2d 757, 759 (Tex. App.—Austin 1932, writ ref'd) ("[T]he courts have been liberal in construing and enforcing as directory only the provisions of the election laws which are not upon their face clearly mandatory.").

was legally and factually sufficient to support the trial court's finding that Juan voted for Daisy illegally. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *Galvan*, 2018 WL 4096383, at *3.

**F.      Yaretzy Campos**

The third finding Daisy challenges for residency is for Yaretzy Campos. Yaretzy is Daisy's first cousin.

The trial court did not expressly find that Yaretzy resided outside District II, but it found she voted for Daisy illegally. The trial court subtracted Yaretzy's vote from Daisy's total, and Daisy contends the evidence was insufficient to support the finding and the subtraction.

We recite some of the evidence pertaining to Yaretzy's residence.

*1.      Yaretzy's Testimony*

Yaretzy testified to the following facts.

a.      Father's Residence

From the time she was in middle school, she lived with her father at 3106 Bismark Street; it is a six- or seven-bedroom house. She lived there with her father continuously until a little after 2013, and then repeatedly returned to live with her father after staying at other locations for a while. Her father and stepmother live there by themselves; she does not live with them because she does not get along well with her stepmother. But she receives her mail there.

b.      Voter Registration Address

Since 2016, her permanent residence has been 3001 Pecos Plaza, and that is her voter registration address. She lives there with her nine-year-old daughter in a four-bedroom house that she and her daughter share with ten other people.

The ten others are Daisy Campos Rodriguez and Vidal Rodriguez, Valerie Campos, Alejandro and Celestina Campos, Celina Ramirez, and Celina Carbajal and her three children.

Her Aunt Celestina and Uncle Alejandro live in one bedroom. She lives in a second bedroom, which has only one bed, with her daughter and Valerie. When asked to confirm that she shares the one bed with her daughter and Valerie, she did: "It's one bed. We fit." In the third bedroom, Celina Carbajal and her three children live in one bed that they share with Celina Ramirez. Daisy and her husband live in the fourth bedroom.

Yaretzy does not pay rent or utilities there, but that is the address on her driver's license.

### c. Rented Apartment

She began working for the City of Laredo in April 2019, and she gave them her address as 2601 Lomas Del Sur, an apartment she "rented . . . for someone under my name," because of the person's credit rating. The person she rented it for did not want to keep it, and she was not able to cancel the lease. She stays there occasionally, but the apartment does not have hot water, cable, or WiFi, "so it's not like a livable place," and she does not live there.

### d. Relationship to Daisy

She and Daisy are close, and they have a good relationship. She helped Daisy with her campaign, including wearing her campaign T-shirt and block walking to encourage people to vote for Daisy, and she voted for Daisy.

### e. Documentary Evidence

Yaretzy's previous and current driver's licenses list her address as 3001 Pecos Plaza. But her Universal Direct Deposit form, dated September 14, 2021, her payroll check stubs for September through November 2022, and her payroll direct deposit form all show her address as 3106 Bismark Street. Her employer's "Demographic Information" report, dated December 20, 2022, also shows her address as 3106 Bismark Street.

f.      Trial Court's Finding

The trial court's finding for Yaretzy reads in its entirety as follows:

> Yaretzy Campos listed 3001 Pecos Plaza as her voter address. She claims she lives there with 12 people and states that the property belongs to her uncle. She states that she lives with her uncle and his wife, Alejandro and Celestina Campos. Her father's address is 3601 Bismark in District III. Her bank records and pay stubs indicate the Bismark address as her address. 2601 Lomas del Sur is on her employee records, which is an apartment that she rents for $800–900 a month that she got "stuck with". She is [Daisy's] cousin, and illegally voted for [Daisy].

g.      Daisy's Arguments

Daisy challenges the trial court's finding that Yaretzy voted illegally. She asserts that Yaretzy "testified consistently and without contradiction that her permanent place of residence was at Pecos Plaza," and "[t]here is no evidence in the record . . . to support that [Yaretzy] had any physical presence at the Bismark address such that it could have been her residence." And she insists there is insufficient evidence to support the trial court's finding.

We disagree.

h.      Sufficient Evidence

At trial, Richie argued that Yaretzy voted illegally because she did not reside in District II. The trial court found Yaretzy voted illegally, but it did not expressly find Yaretzy's residence address. But of the three addresses in the finding, the only one not in District II was Yaretzy's father's address, 3106 Bismark Street.

As the factfinder, the trial court observed Yaretzy first-hand, and it could believe or disbelieve Yaretzy's testimony, regardless of whether if it was contradicted or impeached, and we must give due deference to the trial court's decisions. *See In re A.B.*, 437 S.W.3d at 503; *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005).

Yaretzy testified that she was Daisy's first cousin, they were close, she worked on Daisy's campaign, including wearing a campaign T-shirt and block walking to get people to vote for Daisy, and she voted for Daisy.

In that light, the trial court could have disbelieved Yaretzy's testimony that she and her daughter lived in the same bedroom and shared the same bed with Valerie rather than living in one of the five or six unoccupied bedrooms in her father's home. *See In re A.B.*, 437 S.W.3d at 503; *City of Keller*, 168 S.W.3d at 820. It could have accepted the undisputed evidence that Yaretzy's payroll check stubs, payroll direct deposit form, and her employer's demographic information record all show her address as 3106 Bismark Street, and Yaretzy's testimony that that is where she receives her mail.

The trial court could have found that Yaretzy's residence was 3106 Bismark Street, which is outside District II, and because there was no evidence that she met the requirements for a voter who has moved but has not updated their voter registration address, she voted for Daisy illegally. *See* TEX. ELEC. CODE ANN. §§ 11.003 (voting place), 63.0011 (voter's residence changed); *In re Perez*, 508 S.W.3d 500, 506 (Tex. App.—El Paso 2016, orig. proceeding).

The trial court could also have found that Yaretzy established 3001 Pecos Plaza as her residence to influence the outcome of the District II election, which made her vote illegal. *See* TEX. ELEC. CODE ANN. § 1.015(b) (prohibiting a person from "establish[ing] residence for the purpose of influencing the outcome of a certain election").

Having reviewed all the evidence under a clear and convincing standard, and giving due deference to the factfinder's decisions, we conclude it was legally and factually sufficient to support the trial court's finding that Yaretzy voted for Daisy illegally. *See In re A.B.*, 437 S.W.3d at 503; *Galvan*, 2018 WL 4096383, at *3.

## G.      Patricia Soto

The fourth finding Daisy challenges for residency is for Patricia Soto.  Patricia is Daisy's first cousin.  The trial court found that Patricia did not reside in District II, she voted for Daisy illegally, and it subtracted her vote from Daisy's total.  Daisy contends the evidence was insufficient to support the finding.

We recite some of the evidence pertaining to Patricia's residence.

### 1.      Patricia's Testimony

Patricia testified to the following facts.

#### a.      Family Home

She is a teacher, and she lives at 204 Middleston Drive with her husband and their two minor children.  She has lived there since 2000, and she and her husband own the home.  She was served with process at 204 Middleston Drive, and she confirmed "[t]hat's my main address."

#### b.      Parents' Home

A month before the election, she changed her address to 3304 South Bartlett.  The home at 3304 South Bartlett belongs to her parents, and that is where they live.  She was raised there, she goes there for lunch on her workdays, and she stays with them during the summers when she is not teaching and at some other times.  She has her own bedroom there, she has clothing and personal belongings there, and she "reside[s] the most at 3304 South Bartlett."  But when school starts, she goes back to her home on Middleston Drive.

#### c.      Documentary Evidence

In 2004, she and her husband claimed a residential homestead exemption on their home at 204 Middleston Drive.  Her previous driver's license, which expired on May 11, 2022; her current license, issued on September 1, 2022; her utility, mortgage, and insurance records; and her employer's records show her address as 204 Middleston Drive, Laredo, Texas.  Her Texas Voter

Registration Application, filed on October 8, 2022, changed her address to 3304 South Bartlett, Laredo, Webb County, Texas.

d.      Trial Court's Finding

The trial court's finding reads in its entirety as follows:

Patricia Soto is [Daisy]'s first cousin.  She claimed 3304 S. Bartlett, located in District II, as her residence by changing her registration address after the March 1st primary election.  Her residence is actually 204 Middleston Drive, which is located outside of District II.  She voted illegally for [Daisy].

e.      Sufficient Evidence

As the factfinder, the trial court observed Patricia first-hand, and it could believe or disbelieve Patricia's testimony, regardless of whether if it was contradicted or impeached.  *See In re A.B.*, 437 S.W.3d at 503; *City of Keller*, 168 S.W.3d at 820.

In finding that Patricia's residence was 204 Middleston Drive, it could have given great weight to the evidence that she lived there with her husband and their two minor children; that was her homestead; her previous and current driver's licenses, her mortgage, insurance, utility, and employment records showed that address; she received service of process there; and she confirmed "[t]hat's my main address."  *See City of Keller*, 168 S.W.3d at 819; *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

The trial court could have given very little weight to Patricia's testimony that she spent the summers at her parents' home; she had her own bedroom, clothing, and personal effects there; and that she resided at her parents' home the most.  *See In re A.B.*, 437 S.W.3d at 503; *State v. Wilson*, 490 S.W.3d 610, 618 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

Having reviewed all the evidence under a clear and convincing standard, and giving due deference to the factfinder's decisions, we conclude it was legally and factually sufficient to

support the trial court's finding that Patricia voted for Daisy illegally. *See In re A.B.*, 437 S.W.3d at 503; *Galvan*, 2018 WL 4096383, at \*3.

## H.     Residency Challenges Summary

Having reviewed all the evidence under a clear and convincing standard, we conclude it was legal and factually sufficient to support the trial court's findings that Juan Villa, Yaretzy Campos, and Patricia Soto voted for Daisy illegally. But the evidence that Vicente Rodriguez Jr. voted for Daisy illegally was neither legally nor factually sufficient.

We overrule Daisy's challenges pertaining to Juan, Yaretzy, and Patricia, but we sustain her challenge pertaining to Vicente.

### SUMMARY OF DISPOSITION OF ISSUES

On appeal, Daisy presented four issues, and we have addressed each of them.

In her first issue, she asserted that the trial court abused its discretion by admitting the election administrator's testimony on the most accurate vote record because he was not qualified as an expert and his testimony was speculative and conclusory. We concluded the administrator was qualified as an expert witness, his additional, unobjected-to testimony waived her complaint, his challenged testimony was not speculative or conclusory, and her Rule 701 challenge was not applicable.

In her second issue, Daisy argued the trial court abused its discretion in determining the final canvass by rejecting the results of the manual recount in favor of the election night count, but we concluded the trial court could have found by clear and convincing evidence that the persons involved in the manual recount made a mistake, the manual recount did not show the true outcome, and the election night count and CVR report results accurately reflected the votes cast. We noted that, although the evidence was sufficient without it, the trial court could have also relied on the

election administrator's testimony that the election night count, as verified by the CVR report, was the accurate record of the votes cast.

In her third issue, Daisy argued that the trial court abused its discretion by attributing five illegal votes to her where the voters testified that they did not remember who they voted for, and she presented changed statutory language and sufficiency of the evidence arguments. We concluded her changed statutory language argument was inapplicable, and the evidence was sufficient.

In her fourth issue, she argued the trial court abused its discretion in finding that four voters voted illegally based on their residence. We concluded the evidence was sufficient for three, but not for one.

### DETERMINING THE TRUE OUTCOME OF THE ELECTION

Having addressed each of Daisy's issues, we now consider the effects of our conclusions.

**A.    Final Canvass**

The trial court did not abuse its discretion in rejecting the manual recount as the final canvass and determining that the election night count was the accurate record of the votes cast. As confirmed by the CVR, it showed 1,957 votes for Daisy and 1,951 votes for Richie.

**B.    Illegal Votes**

The trial court found that fifteen voters had voted for Daisy illegally. Daisy did not challenge the trial court's findings that six voters[14] voted for her illegally. Instead, she challenged the trial court's findings for five voters[15] who testified they could not remember who they voted for, but we overruled her challenges.

---

[14] Griselda Elena Cisneros, Kate Meza, Celina Azenneth Ramirez, Raul Rios, Angel Vicharelli, and Bryan Vicharelli.
[15] José A. Carrizales, Jaqueline Estevis, Maria De Los Angeles Martinez, Staci Navarro, and Karla Pereyra.

Daisy also challenged the trial court's findings for four voters based on their residency; we overruled three of her challenges,[16] but we sustained one.[17]

In sum, we conclude the evidence was legally and factually sufficient under a clear and convincing evidence standard to support the trial court's findings of fourteen illegal votes for Daisy.

## C.     Subtracting Illegal Votes

Given there were fourteen illegal votes for Daisy, and an illegal vote "is not legally countable," *see* TEX. ELEC. CODE ANN. § 221.003(b), the trial court's duty was to subtract those fourteen illegal votes from Daisy's official total, *see id.* § 221.011(a); *Garza v. Alcala*, No. 04-04-00855-CV, 2006 WL 1080241, at *8 (Tex. App.—San Antonio Apr. 26, 2006, no pet.) (mem. op.); *Slusher v. Streater*, 896 S.W.2d 239, 241 (Tex. App.—Houston [1st Dist.] 1995, no writ).

The official total of Daisy's votes, using the election night count, was 1,957. Subtracting fourteen illegal votes for Daisy, her vote total becomes 1,943, which is less than Richie's vote total of 1,951. *See* TEX. ELEC. CODE ANN. § 221.011(a); *Garza*, 2006 WL 1080241, at *8.

Even if we were to conclude that the manual recount was the official total, which we do not, it showed 1,956 votes for Daisy and 1,945 votes for Richie. Subtracting the fourteen illegal votes for Daisy, her vote total becomes 1,942, which is less than Richie's vote total of 1,945.

## D.     True Outcome of the Election

We conclude that the true outcome of the November 8, 2022 election for Laredo City Council District II was that Richie received more votes than Daisy, and Richie won the election. *See* TEX. ELEC. CODE ANN. § 221.003(a); *Flores v. Cuellar*, 269 S.W.3d 657, 660 (Tex. App.—San Antonio 2008, no pet.). Accordingly, we affirm the trial court's judgment.

---

[16] Yaretzy Campos, Patricia Soto, and Juan Villa.
[17] Vicente Rodriguez.

**MOTION FOR REHEARING**

In a separate motion and in his brief, Richie emphasizes the fact that the trial court found that he won the election, and he could otherwise be entitled to assume the office. *See* TEX. ELEC. CODE ANN. § 221.015(b). But as he notes, Daisy's appeal has "suspend[ed] the execution of the trial court's judgment pending the disposition of the appeal." *See* TEX. ELEC. CODE ANN. § 232.016; *Grant v. Huberty*, No. 01-18-00040-CV, 2018 WL 3431803, at *1 (Tex. App.—Houston [1st Dist.] July 17, 2018, no pet.) (per curiam) (mem. op.). He asks this court to affirm the trial court's judgment and "refuse to permit a motion for rehearing to be filed." *See* TEX. ELEC. CODE ANN. § 232.014(d); *Flores*, 269 S.W.3d at 662.

We deny Richie's motion to refuse to permit a motion for rehearing; instead, we reduce the time for filing a motion. *See* TEX. ELEC. CODE ANN. § 232.014(e); *Flores*, 269 S.W.3d at 662.

We order that any motion for rehearing or en banc reconsideration must be filed within ten days of the date of this opinion and judgment. *See* TEX. ELEC. CODE ANN. § 232.014(e); TEX. R. APP. P. 49.7; *Flores*, 269 S.W.3d at 662.

The panel will not grant any motion for an extension of time to file a motion for rehearing. *See* TEX. ELEC. CODE ANN. § 232.014(e); *Flores*, 269 S.W.3d at 662.

Patricia O. Alvarez, Justice